[Crim. No. 418. Fourth Appellate District.—June 29, 1937.]

THE PEOPLE, Respondent, v. MAUDE BURNETT et al., Appellants.

614

Edward J. Kelly for Appellants.

U. S. Webb, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

MARKS, J.—Defendants were charged with the crime of attempted grand theft of $500 from the Massachusetts Bonding and Insurance Company. They were found guilty and have appealed from the judgment pronounced upon them and from the order denying their motion for new trial.

The evidence shows that on December 14, 1936, at about 11 o'clock in the morning, defendants entered the Popular Market in the city of San Diego; that Mrs. Burnett slipped and fell; that she was driven to a physician's office by her husband in the family automobile; that the physician bandaged her shoulder and told her to get an X-ray taken on the following day; that before 12 o'clock on the same day Mr Burnett returned to the market and "asked for the proprietor of the store and I told him I was the proprietor of the market and he said, 'My wife has fallen here and broke her collar bone,' and I said, 'Why didn't you leave—call an ambulance and take her to the hospital when she fell?' And he said, 'Well, I assisted her to the car and we had an X-ray taken and showing that her collar bone has been broken,' and so I told him I was insured and I gave him the name of my insurance company, Mr. Munson, and I took his name and address and—pardon me—and turned it over to my insurance company;" that later Mr. Burnett returned again to the market and interviewed the proprietor and wanted a settlement for his wife's injuries and was told by the proprietor that he was "insured and if there were a settlement to be made it will be made by the insurance company and he (Burnett) wanted to know when and where he could get in touch with my agent and I told him, and then he went away".

The accident was reported to the local representative of the Massachusetts Bonding and Insurance Company and an adjuster was sent to the residence of defendants to take their statements. After several calls this young man found defendants at home on the evening of December 15, 1936.

On cross-examination this witness gave the following summary of his conversation with Mr. and Mrs. Burnett:

"Mr. Burnett asked me what the procedure of the insurance company was and I told him it was our business to get a detailed statement from the witnesses and make a complete investigation and then turn that in and it was up to the insurance company to make any settlement. He asked me how long it took for that and I told him generally a week or a week and a half or sometimes a little longer. He said, 'Well, if we have to go to court, it is going to cost them a whole lot more than if we can settle before we go to court,' and I said, 'How much do you want?' or, 'How much will you take in settlement of the case?' and he wanted—and Mrs. Burnett asked me what they generally paid on a case like that and I said they generally liked to take care of the bills, the expenses or just what they were out, and he said, 'Well, I won't take a cent less than four hundred dollars because of the pain and suffering,' and he said, 'If she has to go to the hospital to be treated for her shoulder, why that will run into a great deal of expense,' and he said, 'I won't take a cent less than four hundred dollars, and then on top of that, you will have to pay for a housekeeper.' He said Mrs. Burnett was unable to do her housework and that she had to have a housekeeper come in and do her housework, and I asked him how much that would be over the four hundred dollars. Well, they figured and talked it over and I think they got up to ninety some odd dollars and I asked Mr. Burnett if she thought five hundred dollars would cover the amount of the damage and for her losses and all her expenses and he said, 'Yes, but we won't take a cent less than that, that is, if we don't have to go to court, but if we have to go to court, then we will ask a good deal more than five hundred dollars.'

"Q. Now was it Mr. or Mrs. Burnett that said that? A. Well, they were talking back and forth. He made the last statement about they wouldn't take less than five hundred dollars if they didn't have to go to court. Q. And cover all expenses? A. Yes, sir, for pain and suffering, and Mrs.

Burnett said, 'Yes, I don't want to go to court unless I have to.' 'Well,' I said, 'the insurance companies don't like to take those cases to court either unless they have to do it,' and she said, 'Oh, I wouldn't want to go to court unless we have to,' and then I asked her when I was writing up the statement if that was the amount, the least she would take in settlement and she said, yes.''

The adjuster took a signed written statement from Mrs. Burnett in which the following appears:

''I suffered very much. Last night I suffered all night. Today I went to Dr. Weiskotten's office and he took X-ray pictures. The nurse volunteered the statement that my left collar bone was broken but I have not heard from the doctor himself. . . . . I have never had any bones broken before. I have never been in any accidents before either in San Diego or in any of my former places of residences. I have never made any claims for injuries of any nature before this. . . . In the way of settlement for this accident of December 14th in the Popular Market at 12th and Broadway I will accept $500.00 plus my medical bills and doctor bills and the cost of a housekeeper for the time that I am laid up. . . . I have read the foregoing statement and it is true and correct.''

The adjuster also took a signed written statement from Mr. Burnett in which the following appears:

''She fell in the aisle between the meat department and the produce department and after she fell I noticed some water and beet tops on the floor. I helped my wife up and to the car. I then took her to Dr. McColl's office for treatment as her shoulder was causing her to suffer a great deal. I believe my wife received a fracture to her left shoulder. We do not have the doctor's report as yet. $500.00 plus all expenses will be a satisfactory settlement as far as I am concerned. Neither of us have made claims on insurance companies before, and my wife has never had her collar bone or shoulder injured that I know of before the 14th of December when she fell in the store. I have read the foregoing statement and it is true and correct.''

The X-ray taken of Mrs. Burnett's shoulder showed her collar bone had been broken but that the break was an old one which must have occurred at least several months prior to December 14, 1936. No recent injury was discovered. A physician who attended Mrs. Burnett on September 3,

1936, testified that he discovered her collar bone had been broken prior to that time.

It seems to be proven beyond any reasonable doubt that defendants' claim that Mrs. Burnett's collar bone had been broken or that she had been otherwise injured in her fall was false and that her injury was falsely claimed for the sole purpose of collecting damages from the owner of the Popular Market or its insurance carrier in a sum of not less than $500.

Over the strenuous objections of defendants the People were permitted to prove the following facts: That in November, 1930, defendant O. E. Burnett, under the name of T. E. Eberling, carried public liability insurance on his automobile with The State Farm Mutual Automobile Insurance Company; that on November 14, 1930, he appeared in the office of that company in Berkeley, California, and imparted the information that in backing his car on a public street in Oakland he had knocked down and injured a woman; that there were reasons why an immediate settlement of the damages should be made. An adjuster went with Burnett (Eberling) to a hotel in Oakland where they found a Miss or Mrs. Ella Harper in bed suffering with abrasions down her legs and what she claimed was a broken rib. The woman (who was actually Mrs. Maude Burnett) claimed to live in Salt Lake City and that her immediate return to her home was imperative. The adjuster testified that "I finally settled with her, made out checks and saw to it, got an ambulance to take her to the station, made reservations at the S. P. station for her to take that night train to Salt Lake City, . . . " The insurance carrier became suspicious of the transaction and stopped payment on its checks. The adjuster went to Los Angeles and found defendants, Maude and O. E. Burnett, whom he had known as Ella Harper and T. E. Eberling, attempting to cash the checks. They were taken to the office of the district attorney of Los Angeles County where they confessed their fraud. They were subsequently charged with their crimes in Alameda County and entered their pleas of guilty.

Defendants, as their sole ground for reversal of the judgment, urge that the admission of this evidence was reversible error as its sole purpose was to prove their convictions of a crime separate and distinct from the one for which they were on trial. We cannot agree with this contention.

The following portions of section 484 of the Penal Code are pertinent to this appeal:

"Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, . . . is guilty of theft." (For attempts, see secs. 663 and 664, Pen. Code.)

The gravamen of the offense charged in the instant case is that defendants knowingly and designedly attempted to defraud the Massachusetts Bonding and Insurance Company by means of false or fraudulent representations or pretenses. It became incumbent upon the People to prove that defendants' attempt to procure money from the insurance carrier was by means of false or fraudulent representations or pretenses and that such representations were knowingly and designedly made.

In addition to the direct claim of injury to Mrs. Burnett in her fall, defendants also made the following representations: That Mrs. Burnett had never suffered an accident before and that she had never before made any claim for any injuries suffered by her. It seems evident that these representations were of material facts germane to the inquiry into the justness of the claim of Mrs. Burnett for compensation for her purported injuries. If these representations had been accepted by the insurance carrier as true, it might have followed that a less vigorous investigation of the purported accident would have been made. It might be concluded that defendants, as a voucher of good faith on their part, made these representations with the desire to conceal any former claim of damages for injuries having been made by Mrs. Burnett. It must be conceded as true, that these representations were falsely made with the intention of concealing the fact that defendants had participated in a prior fraudulent claim made to secure compensation from an insurance carrier.

If, as we believe, these representations were of material facts, then the People could prove their falsity as a part of the case in chief for they were part of the false or fraudulent representations or pretenses whereby defendants attempted to defraud the insurance carrier. (Sec. 484, Pen. Code.) ▮ However, under this phase of the case, the proof should have been limited to the falsity of the actual representations made, namely, that Mrs. Burnett had never suffered an accident before and that she had never before made any claim

for any injuries suffered by her. Evidence of the fact that defendants had made prior statements that Mrs. Burnett had suffered a prior accident was admissible to prove the falsity of the first representation and the fact that she had made a claim on an insurance carrier for compensation for her supposed injuries was also admissible to prove the falsity of the second representation. In *People* v. *Morani,* 196 Cal. 154 [236 Pac. 135], it is said:

"It is well settled that a defendant in a criminal case can be tried for no other offense than that charged in the indictment or information, and therefore it is not competent for the prosecution to prove the commission of independent crimes by the defendant, the evidence of which has no tendency to prove some material fact in connection with the particular crime charged. But this rule does not exclude such evidence when it logically tends to prove any fact necessary or pertinent to the proof of the crime for which the defendant is being tried. Such evidence is not to be rejected because it also tends to prove the commission of other crimes or because it may prejudice the defendant in the minds of the jurors. Generally speaking, such evidence is admissible when it tends to establish intent, guilty knowledge, motive, a common scheme, plan or system, or when it tends to connect the defendant with the crime charged, or when the other crimes are part of the *res gestae* (8 Cal. Jur., p. 60 et seq.)"

It was also incumbent on the People to prove that the claim for compensation in the instant case was not only false and fraudulent but that it was knowingly and designedly made with the intent to defraud the insurance carrier. In *People* v. *Robinson,* 107 Cal. App. 211, at 224 [290 Pac. 470], it is said:

"Evidence of similar transactions is admissible to show guilty knowledge or intent, it being held that in such cases the transactions sought to be shown must contain the material elements of the main case. (*People* v. *Whiteman,* 114 Cal. 338 [46 Pac. 99]; *People* v. *Bird,* 124 Cal. 32 [56 Pac. 639]; *People* v. *King,* 23 Cal. App. 259 [137 Pac. 1076]; *People* v. *Byrnes,* 27 Cal. App. 79 [148 Pac. 944].)"

We therefore conclude that the challenged evidence was admissible because it tended to prove the falsity of material representations made by defendants and that they were

knowingly and designedly made with the intent to defraud the insurance carrier.

 If we had reached the conclusion that the evidence of the other crime was not admissible still we would not have reversed the judgment. The other evidence of defendants' guilt is too clear and convincing to permit us to believe that there has been any miscarriage of justice in this case. (Sec. 4½, art. VI, Const.)

The judgment and order appealed from are affirmed.

Barnard, P. J., and Jennings, J., concurred.