[No. D024695. Fourth Dist., Div. One. Aug. 20, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
VERNELL GILLARD, Defendant and Appellant.

138

**COUNSEL**

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McDONALD, J.**—Appellant Vernell Gillard (Gillard) was convicted of three counts of violating Insurance Code[1] section 1871.4, subdivision (a)(1) (making false or fraudulent statements for the purpose of obtaining workers' compensation benefits) and one count of violating Penal Code section 118, subdivision (a) (perjury). In a bifurcated proceeding, the court found true the allegations that Gillard had served a prior prison term within the meaning of Penal Code section 667.5, subdivision (b), and had two prior serious or violent felony convictions within the meaning of Penal Code section 667, subdivisions (b)-(i). Gillard was sentenced to a prison term of 26 years to life.

---

[1] All further statutory references are to the Insurance Code unless otherwise specified.

I

FACTS

In July 1993 Gillard claimed he suffered a work-related injury during employment by the Del Mar Fair (the Fair). The fraud and perjury counts charged Gillard with making material misstatements about his medical history to obtain workers' compensation benefits from the Fair for the injury.

A. *Gillard's Pre-1993 Medical History*

1. *Pre-1987 Injuries*

Gillard has a long history of mishaps. In 1976 he filed a lawsuit alleging an injury in a 1975 slip-and-fall accident. His medical records contained references to back injuries he allegedly sustained in 1976 and 1979. He claimed a neck injury from a 1982 car accident, and an injury to his right leg from a 1983 car accident for which he received a $3,000 settlement.

In 1985 Gillard claimed he injured his back and tailbone in an April slip-and-fall accident but received nothing on the claim. He sought compensation for an alleged injury incurred in a May 1985 slip-and-fall accident and recovered a $4,250 settlement for that claim.

In 1986 Gillard made his first claim for workers' compensation benefits. He alleged he had injured his back during a fall while working for Abache Construction. He received a $3,000 settlement for a permanent partial disability to his back.

2. *Gillard's April 1987 Knee Injury*

On April 18, 1987, Gillard was injured when he walked into the path of an oncoming car. He retained Attorney Gregory Montegna (Montegna) to represent him in a personal injury claim arising from that accident. Although Montegna did some initial work, including obtaining photographs depicting Gillard's injuries, Montegna concluded he could not assist Gillard and closed his file.[2]

On May 6, 1987, Gillard was examined by Dr. Hansen in connection with the April 18 accident. Gillard denied any prior history of injuries to his back or extremities and complained of headaches, blurred vision, dizziness, and pain in his neck, lower back, left ankle and both knees.

---

[2]Montegna's conclusion may well have been influenced by the driver's lack of insurance.

Dr. Hansen noted significant problems in Gillard's right knee, including swelling and effusion in the joint and extreme pain and swelling around the medial collateral ligament. Dr. Hansen's clinical impressions of Gillard's injuries were a torn right knee, fractured rib, and sprains of the right ankle, neck and low back.

Dr. Hansen ordered X-rays be taken. Dr. Gilligan interpreted those X-rays and reported that Gillard's right knee showed an osseous fragment (piece of bone), measuring three by eight millimeters, above the lateral intercondyloid eminence. Dr. Hansen said a bone fragment could cause popping sounds in the knee and pain when squatting; he said it was not probable the fragment would heal without surgery.

### 3. *Gillard's 1987 Workers' Compensation Claim*

Later in 1987 Gillard was employed by Allied Builders. On November 9, 1987, Gillard allegedly injured his right knee at work. On November 10, 1987, Gillard visited Dr. Dentice, a chiropractor Gillard had previously seen for other injuries, and complained of pain in his right knee, right ankle and lower back. Gillard claimed the injury occurred when a brick struck his right knee.

On January 28, 1988, Dr. Bowman examined Gillard for purposes of evaluating Gillard's alleged industrial injury. Gillard's principal complaint was right knee pain from a twisting injury, which he claimed was the result of being injured at work when he was struck by a brick. Gillard denied any prior injury to that knee. The symptoms Gillard described included his knee "giving way" and his inability to do deep knee bends. Dr. Bowman diagnosed injury to the inner medial and the anterior cruciate ligaments, recommended surgery, and opined that without surgery "[Gillard] will continue to experience giving way and disability as a result of the injury."

Because Dr. Bowman was unaware of Gillard's April 1987 knee injury, Dr. Bowman's 1988 report opined the damage to Gillard's knee arose from the brick incident. ■■■ ■■ However, Dr. Bowman testified that had he been aware of the April 1987 injury and seen Hansen's and Gilligan's reports and the photographs of Gillard's knee, he would have formed a different opinion as to the cause of the ligament damage and also would have changed his views on "apportionment."[3] Dr. Bowman testified the ligament damage he found in 1988 was more consistent with the April 1987 injury

---

[3]When an employee has suffered a previous permanent disability, and is again injured and suffers an additional permanent disability from the new injury, an employer's liability can be reduced by the process of apportionment. This process allocates the total permanent disability

than with the brick injury. Bowman opined it was unlikely Gillard's April 1987 injury would have healed without surgical intervention.

On April 20, 1988, Gillard was examined by Dr. Wieseltier, to whom he complained of knee and lower back pain. Gillard again denied prior injuries. Based on Gillard's description of the alleged injury, Dr. Wieseltier questioned whether Gillard had a preexisting knee injury because: (1) an "MRI" scan of the knee in November 1987 revealed degeneration of the medial and lateral menisci suggestive of a preexistent pathology; and (2) the alleged cause of injury (a sliding brick striking Gillard's knee) would not by itself have caused the types of injuries found by Dr. Wieseltier. However, Gillard's denial of prior injuries prevented Dr. Wieseltier from disproving that Gillard's knee injuries were unrelated to the brick injury. On June 17, 1988, Dr. Wieseltier reexamined Gillard and reported that Gillard was impeding his own progress by not complying with the prescribed course of therapy. Dr. Wieseltier's final report, dated September 14, 1988, stated Gillard's knee was improving and his condition was permanent and stationary.[4] Dr. Wieseltier believed that Gillard was not in need of surgery. Regarding apportionment, Dr. Wieseltier's report opined: "The patient denies any prior history of knee problems; however, as stated in my initial report . . . , I questioned whether or not the patient had a preexistent knee condition, and it may be important in the future to deal [sic] more into the patient's past history, if he is found to have any permanent disability by another examiner."

On October 18, 1988, Gillard's claim against Allied Builders for his alleged back and leg injuries was settled for $2,350. This compromise was approved by the Workers' Compensation Appeals Board (WCAB) on December 12, 1988.

4. *Gillard's 1988 Workers' Compensation Claim*

In December 1988, eight weeks after settling with Allied Builders, Gillard claimed he suffered a back injury when he tripped and fell while working for McDowell Construction Company. After receiving initial treatment from Dr. Dentice, Gillard was examined by Dr. Doholis to evaluate Gillard's residual

---

between the permanent disability caused by the new injury and the permanent disability caused by the preexisting injury, and charges the employer only with the amount of the permanent disability allocated to the new injury. (*Ashley* v. *Workers' Comp. Appeals Bd.* (1995) 37 Cal.App.4th 320, 326-327 [43 Cal.Rptr.2d 589].)

[4]Dr. Wieseltier noted that the instability of Gillard's knee was a chronic condition as of 1988 and would have continued to cause abnormal wear and tear on the meniscus. Dr. Wieseltier opined at trial that such wear and tear, if unabated by surgical correction, could cause a tear in the meniscus even without additional trauma to the knee.

disability. Gillard again denied any prior injuries to his lower back and to any other part of his body. Dr. Doholis believed that Gillard was exaggerating his complaints and had lied about the absence of prior injuries.

Gillard collected nearly $5,000 in "temporary disability" pay from the McDowell injury for the period December 1988 through May 1989, at which time he was declared "permanent and stationary" because he had reached his pre-injury level of capability. In September 1989 Gillard was referred to Dr. Auerbach for evaluation of any residual disability. Gillard told Dr. Auerbach about his 1986 back injury at Abache Construction and 1983 knee injury, but he did not disclose his other back injuries or his 1987 car accident. Knowledge of Gillard's prior back injuries would have "weighed heavily" on Dr. Auerbach's assessment of what portion of Gillard's residual disability should have been apportioned to preexisting disabilities. Dr. Auerbach ultimately concluded that Gillard's residual disability should preclude him from very heavy work, and that 25 percent of Gillard's disability was apportionable to the 1986 injury and the remaining 75 percent apportionable to the injury incurred while working for McDowell. Gillard settled his claim against McDowell for more than $12,000.

## B. *Gillard's 1993 Workers' Compensation Claim: the Charged Offenses*

Gillard was hired as a janitor at the Fair. On July 2, 1993, two weeks after beginning work and two days before the end of the Fair season, he claimed he was injured when struck by a security cart. The criminal charges in this case arise from Gillard's efforts to collect workers' compensation benefits for injuries he claimed he received in this incident.

### 1. *The Incident*

Robert Todd (Todd) was a security guard at the Fair. At approximately 9 a.m. on July 2, Todd parked his electric cart near the pay windows on a slight incline.[5] Todd was accompanied by Greg Pratt and two other guards. The four men had returned to the cart and climbed into it. Todd drove and had looked behind the cart approximately three seconds before climbing into it and had seen no one near it. Pratt had looked back when he climbed into the cart and had seen that the nearest person was 15 feet away. Immediately upon climbing into the driver's seat Todd released the hand brake and the cart rolled about two feet backward, at which point he heard a thump from

---

[5]The slope of the ground where the cart was parked declined a total of eight inches over a seventeen-foot span.

the back and felt a jolt.[6] Pratt heard the "bang" and immediately turned and saw Gillard sitting straight up on the back platform of the cart, facing the rear of the cart. Pratt said the "bang" he heard resembled the sound made when he jumped up and sat down on the bed of the cart.

Todd set the brake and got out of the cart. Within three seconds of hearing the initial impact he saw Gillard standing about two feet from the cart facing it. Both Pratt and Todd repeatedly asked Gillard if he was hurt, and Gillard indicated he was not. During the 10 minutes Todd remained at the scene, Gillard did not limp or hold his back.

Gillard's supervisor, Richard Bannan, was told Gillard had been injured. Bannan saw Gillard lying in the first aid station with an ice pack on his leg. Gillard told Bannan he had been hit by the cart. During the 15 minutes Bannan was with Gillard at the first aid station, Gillard appeared to be his "jovial self" and Bannan noticed no signs Gillard was in pain.

Bannan left the first aid station but returned 45 minutes later and found Gillard asleep. Bannan was notified around 11 a.m. that Gillard was being released to return to work. When Bannan returned he saw Gillard standing firmly on both feet talking to some men. Bannan suggested that he and Gillard go to a doctor. Gillard said he wanted to eat lunch, and Bannan urged him to do so, after which they would visit a doctor. Although Gillard had 30 minutes for lunch he did not return for 90 minutes. When Bannan asked Gillard where he had been, Gillard stated he left to call an attorney.

Bannan then drove Gillard to Doctor Moore's office in Bannan's Jeep. Gillard had no difficulty entering or leaving the Jeep, even though the seat is high above the ground. Gillard did not complain of any pain on the drive to the doctor. When Bannan picked Gillard up from the doctor's office one hour later, Gillard again climbed into the Jeep without assistance. The doctor's slip stated Gillard should have "light duty" and not lift objects over 20 pounds. After returning to the Fair from the doctor's office, Bannan never saw Gillard again. Todd saw Gillard about 2:30 that afternoon and was told Gillard was on his way to pick up his paycheck.

Doctor Moore treated Gillard on July 2. Gillard told her that as he stood in a certain location, a small cart hit him from the rear on his right leg and

---

[6]The cart was moving "extremely slow" according to Pratt and less than one mile per hour according to Todd.

lower back and his glasses flew off.[7] Gillard complained of pain in his lower back but not in his right leg. He denied any prior injuries. Doctor Moore did not believe that Gillard was seriously injured and released him for light duty.

On July 14 Gillard notified the Fair he was designating Dr. Dentice in place of Dr. Moore as his treating physician. On July 22 the Fair was notified that Attorney John Kiwan (Kiwan) was representing Gillard.

The Fair paid no temporary disability because Dr. Moore's report stated Gillard was not disabled. Because of discrepancies in the information provided, the case was immediately referred to attorneys. When the Fair and Gillard could not agree on an "Agreed Medical Examiner" (AME), Gillard designated Dr. Roland as his "Qualified Medical Examiner" (QME) and the Fair designated Dr. Murphy as its QME.[8]

### 2. Count One: Misrepresentation on October 13, 1993

Count one was based on Gillard's misrepresentation to Dr. Roland on October 13, 1993, that he had not suffered a prior injury to his right knee or back. When Gillard appeared for examination by Dr. Roland on October 13, 1993, Gillard completed a questionnaire stating the injury resulted from being struck by a cart; the symptoms of the injury were pain in the right knee and back; and he had no prior injuries. During his physical examination Gillard complained of right knee pain, including swelling, locking, giving way, limping, and noise in the joint; he reaffirmed he had no prior injury to the knee.

Dr. Roland noted there was evidence of significant knee damage, including laxity in the medial collateral ligament and a possible meniscus tear. Because Gillard had represented he had no prior injury to the knee, Dr. Roland said apportionment was not an issue and opined Gillard's knee injury was attributable to the July 2, 1993 incident. Had Dr. Roland been aware of Gillard's prior knee injuries, he would have considered apportionment of Gillard's residual disability to be an issue.

---

[7]While Gillard worked at the fair Bannan saw him every day, several times a day, and never saw him wearing glasses. Todd said that while at the scene he did not see Gillard wearing glasses and Gillard made no mention of glasses.

[8]Doctors' reports play a central role in assessing the medical issues, including the existence and degree of any permanent disability resulting from an industrial injury. (1 Herlick, Cal. Workers' Compensation Law (5th ed. 1996) § 4.29, pp. 4-35 to 4-37.) When the compensability of an alleged injury is disputed, the parties may submit the issue based on the report of an AME if they can agree on the doctor, or they may obtain individual reports from a QME if they cannot agree on an AME. (2 Herlick, supra, at § 15.4, pp. 15-12 to 15-24.)

### 3. *Count Two: Misrepresentation on March 23, 1994*

Count two was based on Gillard's misrepresentation to Dr. Roland on March 23, 1994, that he had not suffered a prior injury to his right knee. Dr. Roland had requested an MRI scan, which was then interpreted by Dr. Eilenberg. The MRI of Gillard's right knee reflected a markedly abnormal tear of the medial meniscus and a thickening of the medial collateral ligament. Dr. Eilenberg, who was unaware of Gillard's denials of prior injury, opined the thickening suggested a possible old injury. However, Gillard continued to deny any prior knee injury in response to Dr. Roland's further questioning.

Dr. Roland stated that based on Gillard's lack of prior injuries or disabilities: (1) Gillard's disability was attributable to the July 2, 1993, incident; (2) no apportionment was indicated; and (3) Gillard's knee injury caused him to lose approximately 50 percent of his preinjury capacity for various activities. Dr. Roland also stated that had he known of the reports of Doctors Hansen, Gilligan and Bowman regarding the 1987 knee injury, and the reports of Doctors Wieseltier and Doholis, he would have considered apportionment and assessed the degree of preexisting disability. After reviewing those reports and the photographs of Gillard's knee obtained from the files of attorney Montegna, Dr. Roland believed apportionment was "absolutely" required in Gillard's claim against the Fair.

### 4. *Count Three: Misrepresentation on April 8, 1994*

Count three was based on Gillard's misrepresentation to Dr. Murphy on April 8, 1994, that he had suffered no prior injury to his right knee. Gillard told Dr. Murphy he was looking at his paycheck when a cart struck him from behind and flipped him up and onto its bed. Gillard complained his knee would "pop" when he walked, give way when he twisted, and occasionally become swollen. Gillard denied any prior injuries to or symptoms in his right knee.

Dr. Murphy had access to some of Gillard's prior medical records, including the reports of Doctors Bowman and Wieseltier relating to Gillard's claimed knee injury against Allied Builders, but Dr. Murphy was not aware of the reports of Doctors Hansen and Gilligan regarding the severe 1987 knee injury. Those latter reports and the facts of the 1987 accident were significant because the reports showed a serious knee injury, which would have had a significant impact on the issue of apportionment had that issue become relevant to Dr. Murphy's assessment. Additionally, those reports were significant considering the 1994 MRI findings of a meniscus tear. A

meniscus tear does not usually occur with the minor blunt force that allegedly caused the Fair injury, but usually requires a forceful twisting of the knee caused by an impact like that of the 1987 car accident. Because the cause of injury described by Doctors Gilligan and Hansen would be more consistent with a meniscus tear, knowledge of that injury would be significant to a QME's assessment of the cause of the pathology noted on the MRI.

### 5. *Count 4: Perjury Before the WCAB*

Count four was based on Gillard's testimony under oath during the WCAB hearing on his claim against the Fair. Using Dr. Roland's report, Gillard made a settlement demand for $17,500 based on a 30½ percent disability. The matter was tried before the WCAB. Gillard was asked under oath whether he had any prior injuries to his right knee other than the Allied Builders claim, and he testified "no." The WCAB judge concluded that an industrial injury occurred on July 2, 1993, and that Gillard was entitled to temporary disability payments and medical expenses but had suffered no permanent disability.

## II

### CONTENTIONS

Gillard makes numerous appellate claims. His principal claim is that as a matter of law his misrepresentations were not "material" within the meaning of section 1871.4 because prior injuries are relevant only if they resulted in a disability as to which apportionment is required, and there was no evidence he had an apportionable preexisting disability. In a closely related contention he claims the trial court misinstructed the jury on the definition of material representation. He also argues: (1) Dr. Roland's testimony does not provide substantial evidence that apportionment was an issue; (2) Gillard's conviction on count three must be reversed because his statement to Dr. Murphy was not material, Dr. Murphy having concluded Gillard had no permanent disability from the Fair incident; (3) his conviction on count one must be reversed because his condition was not permanent and stationary when Dr. Roland initially examined him, making irrelevant the existence of prior injuries; and (4) the perjury count was based on an incomplete rather than a false statement.

Gillard's other substantive claims assert: (1) his attorney-client privilege was violated, requiring that we reverse and remand to determine whether the prosecutor should be recused from prosecuting this matter; (2) evidence of his pre-1987 injuries was improperly admitted; and (3) collateral estoppel

barred the prosecution from relitigating whether Gillard suffered an injury on July 2, 1993. Gillard also claims sentencing error.

## III

### ANALYSIS

#### A. *The Instruction on Materiality Was Correct*

Materiality of the false statement is an element of the offense described in section 1871.4, subdivision (a)(1). The trial court instructed, without objection, that "A statement or representation is material if it concerns a subject reasonably relevant to the . . . investigation [of the insured], and if a reasonable insurer would attach importance to the fact represented." Gillard contends the instruction should have advised the jury that to be material the false statement must have had a "tendency to influence" the decision of a reasonable insurance company.

We are satisfied the instruction, derived from *Cummings* v. *Fire Ins. Exchange* (1988) 202 Cal.App.3d 1407 [249 Cal.Rptr. 568], adequately informed the jury of the appropriate standard of materiality. In *Cummings*, the claimant made a false statement seeking to recover benefits on a casualty policy but argued the statement was not material. The *Cummings* court, relying on the analysis in *Claflin* v. *Commonwealth Ins. Co. of Boston, Mass.* (1884) 110 U.S. 81 [3 S.Ct. 507, 28 L.Ed. 76], concluded the materiality of a statement is not determined by the actual effect the statement had on the outcome of the investigation: "Rather, a question and [an] answer are material when they relate to the insured's duty to give to the insurer all the information he has as well as other sources of information so that the insurer can make a determination of its obligations. Thus, materiality is determined by its prospective reasonable relevance to the insurer's inquiry. . . . *[I]f the misrepresentation concerns a subject reasonably relevant to the insured's investigation, and if a reasonable insurer would attach importance to the fact misrepresented, then it is material.*" (*Cummings*, *supra*, at pp. 1416-1417, italics in original.)

Although *Cummings* was decided in a civil context, the use of the *Cummings* instruction in criminal cases is supported by analogous criminal cases involving insureds who were charged with attempted grand theft by false pretenses. In *People* v. *Burnett* (1937) 21 Cal.App.2d 613 [69 P.2d 1028], the insured claimed an injury from a slip-and-fall accident and, in response to the insurer's investigation, falsely denied any prior injury or any prior insurance claims. The *Burnett* court stated at page 618: "It seems evident that

these representations were of material facts *germane to the inquiry into the justness of the claim* of Mrs. Burnett for compensation for her purported injuries. If these representations had been accepted by the insurance carrier as true, it might have followed that a less vigorous investigation of the purported accident would have been made." (Italics added.)

More recently, in *People* v. *Reed* (1961) 190 Cal.App.2d 344 [11 Cal.Rptr. 780], a claimant made misrepresentations of no prior accidents, injuries or claims as part of an effort to collect insurance proceeds for alleged personal injuries. The *Reed* court stated at page 352: "Those representations with reference to having had no prior accidents or injuries and having made no prior claims were material representations which had *a direct bearing on the decision of the insurer as to the bona fides of the claims* and as to whether the insurer should deliver money to defendants in settlement of their claims. The insurance adjuster, to whom the defendants presented their claims . . . testified . . . that such representations were material. Also, several other adjusters testified that such representations were material in evaluating insurance claims." (Italics added.)

These cases confirm that materiality of false statements to obtain insurance benefits is met if the statements convey information on subjects which are "germane" or "reasonably relevant" to the insurer's investigation and which could bear directly and importantly on the investigation and evaluation of the bona fides of the claim. The instruction in this case adequately conveyed these concepts.

Gillard argues the instruction should have specified that materiality requires a showing that the omitted information had a "tendency to influence" the decision and that the omission of this phrase made the instruction erroneous. The perjury cases on which Gillard relies held the statement is material if it had " ' "a natural tendency to influence, *or [be] capable of influencing*, the decision of the decisionmaking body to which it was addressed." ' " (*People* v. *Kobrin* (1995) 11 Cal.4th 416, 424 [45 Cal.Rptr.2d 895, 903 P.2d 1027], quoting *United States* v. *Gaudin* (1995) 515 U.S. 506, 509; [115 S.Ct. 2310, 2313, 132 L.Ed.2d 444], italics added.) We perceive no substantive distinction between instructing a jury it may find a statement is material if it is "capable" of influencing the decision and instructing a jury it may find a statement is material if the statement is relevant and important to the insurer's investigation of the claim. An insurer investigates claims not out of idle curiosity but because a decision must be made as to payment, and a determination that a statement was important and relevant to the investigation necessarily includes a finding the statement had the capacity to affect the decisionmaking process.

**B.** *There Is Substantial Evidence Gillard's Misrepresentations Were Material Under the Circumstances of This Case*

 Gillard's principal contention is that when a claimant is prosecuted for violating section 1871.4, subdivision (a)(1) based on failure to disclose a prior injury, an essential element of the offense is that the claimant's prior injuries produced a labor-disabling condition which remained extant at the time of his new injury. Absent that evidence, Gillard reasons, a claimant's intentional concealment of those prior injuries cannot be material because they have no effect on the award for the current industrial injury.

Gillard's argument is based on the premise that prior injuries are relevant to a QME's examination and to a WCAB hearing in only one respect: apportionment. From this premise, Gillard theorizes that absent proof the prior injuries produced a residual disability, those injuries are immaterial to the employer's liability for the temporary and permanent disabilities the new injury has produced.

We reject Gillard's claim. First, there is substantial evidence to support the conclusion Gillard in fact suffered no knee injury from the 1993 incident (he may have "staged" the event) but nevertheless sought benefits by claiming the condition of his knee was attributable to the 1993 incident because he had no prior problems with that knee.[9] Accordingly, the prior injuries were material because an accurate medical history could have provided the QME and the WCAB an alternative explanation for the etiology of Gillard's knee condition shown in the 1994 MRI: that it was not the result of a 1993 bump but instead resulted from his 1987 injury. Second, even assuming Gillard's knee was "bumped" in the 1993 incident, an accurate history would have provided the Fair with an additional defense in the WCAB hearing because the medical testimony showed that apportionment would have become germane to those proceedings had Gillard given an accurate history.

1. *Relevant Principles of Workers' Compensation*

 An employee who suffers a work-related injury is entitled to various benefits under workers' compensation law. Among the benefits are tempo-rary disability payments which substitute for lost wages during the period of temporary incapacity (*Livitsanos* v. *Superior Court* (1992) 2 Cal.4th 744,

---

[9]Gillard, implicitly recognizing this gap in his argument, claims that because the WCAB found he in fact was injured on July 2, 1993, the prosecution was collaterally estopped from relitigating whether any injury occurred and hence was limited to litigating whether the injury was apportionable. We reject Gillard's collateral estoppel argument for the reasons discussed below.

752-753 [7 Cal.Rptr.2d 808, 828 P.2d 1195]), permanent disability payments which indemnify the worker for lost future wages if a residual disability remains after the healing process is complete (*ibid.*), and medical benefits (*Ferguson* v. *Workers' Comp. Appeals Bd.* (1995) 33 Cal.App.4th 1613, 1619 [39 Cal.Rptr.2d 806]). However, a predicate to a worker's entitlement to *any* of these benefits is that the injury and resulting disability be industrially occasioned. (*Chavez* v. *Workmen's Comp. Appeals Bd.* (1973) 31 Cal.App.3d 5, 11 [106 Cal.Rptr. 853].)

■ If the injury is work related, the worker is entitled to temporary disability payments and medical treatment without apportionment even if a nonindustrial cause or prior condition contributed to the disability. (*McGlinn* v. *Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 527, 535 [137 Cal.Rptr. 326].) However, when there is a preexisting disability which is labor disabling, and the worker suffers a new injury creating an additional disability, the process of apportionment is used to assure that the employer is held liable only for the permanent disability attributable to the later injury. (*King* v. *Workers' Comp. Appeals Bd.* (1991) 231 Cal.App.3d 1640, 1646-1647 [283 Cal.Rptr. 98].)

Apportionment is not applicable if the preexisting condition was not labor disabling. When the employee has a preexisting *nondisabling* condition or pathology which is aggravated by an industrial injury, the employer is liable for the entire disability even though the employee's physical condition contributed to or increased the disability caused by the industrial injury. (2 Witkin, Summary of Cal. Law (9th ed. 1987) Workers' Compensation, §§ 282-283, pp. 846-847.) However, apportionment is appropriate for a preexisting pathology when an employer demonstrates that some portion of the disability would have resulted from the normal progress of the pathology even without the industrial aggravation of that pathology. (*Pullman Kellogg* v. *Workers' Comp. Appeals Bd.* (1980) 26 Cal.3d 450, 454 [161 Cal.Rptr. 783, 605 P.2d 422].)

With these principles in mind, we examine whether substantial evidence supports the conclusion Gillard's failure to disclose his prior injuries and preexisting conditions was material.

### 2. *Gillard's Prior Injury Was Material to the Cause of His Knee Condition*

■ We first conclude there is substantial evidence to support a conclusion Gillard suffered no trauma to his knee on July 2, 1993. His failure to disclose prior injuries was therefore material because it misled the

QME's into attributing his knee condition to industrial causes rather than to prior injuries and enabled Gillard to collect benefits to which he was not entitled.

Witnesses Todd and Pratt testified that no one was within 15 feet of the back of the cart when they climbed into the cart, and that the cart had only moved a couple of feet at a very slow speed when Pratt heard a "bang" similar to the sound caused by jumping up and sitting down on the bed of the cart and saw Gillard sitting on the bed of the cart. A jury could infer Gillard simply moved behind the cart and jumped onto it to "stage" an incident.[10] The lack of any knee injury is further supported by Todd's testimony that immediately after the accident Gillard denied being hurt and showed no signs of pain, Pratt's testimony that Gillard had no difficulty getting off the cart, Bannan's testimony that Gillard showed no signs of knee pain and had no difficulty climbing into or out of the high seats in Bannan's Jeep, and Dr. Moore's testimony that Gillard made no complaints of pain in his right knee.

Gillard's denial to Doctors Murphy and Roland of any prior injuries and his similar testimony before the WCAB was material because it enabled him to disguise the true causes of his knee condition and allowed him to collect benefits based on his contention that his knee condition was attributable to the incident of July 2, 1993, rather than to a preexisting condition. Dr. Roland's final report noted that Gillard had a torn meniscus but had denied any prior injury to that knee, and that "[a]ssuming this is accurate and absent evidence to the contrary, his current right knee complaints were caused by the industrial injury of July 2, 1993." A trier of fact could well conclude Gillard's misrepresentations were material because Dr. Roland's opinion of causation would have differed had he been aware of the nature and severity of the 1987 knee injury.[11] Similarly, by denying any prior injury Gillard denied Dr. Murphy information material to assessing whether his knee

---

[10]This conclusion is further supported by other evidence. For example, the first version Gillard told Dr. Moore was that he was standing when struck and his glasses flew off. However, he made no mention of glasses to Todd or Pratt while at the site, and his supervisor had never seen him wearing glasses. Gillard later embellished the events by telling Dr. Murphy that he was standing and reading his paycheck when he was struck. This image of a stationary, inattentive reader appears inconsistent with the testimony of Todd and Pratt that no one was near the cart in the seconds before impact, and is irreconcilable with Todd's testimony that he saw Gillard many hours later that day and was told Gillard was on his way to collect his paycheck.

[11]Dr. Roland confirmed that, after being made aware of Gillard's full medical history, he believed the ligament component of Gillard's knee problems predated the July 2, 1993, incident and that although the meniscus tear could have occurred in 1993, it could also have been attributable to the prior injury because the mechanics of the 1987 injury were more consistent with a meniscus tear than were the mechanics of the 1993 incident. Gillard argues the evidence showed he had no preexisting disability and was in fact injured as a result of the 1993 bump because the 1987 MRI showed no meniscus tear yet the 1994 MRI revealed a meniscus tear. Gillard's contention ignores the testimony of Dr. Roland that the technology of

condition was attributable to the 1993 incident rather than an earlier incident. Dr. Murphy specifically opined that Gillard's description of the 1993 injury would not have produced the torn meniscus pathologies noted on the 1994 MRI, and Dr. Murphy suspected even before he had access to information about the 1987 injury that the pathologies noted on the 1994 MRI were the product of degenerative changes from preexisting conditions. Because Dr. Murphy testified that the mechanics of the injury in 1987 were more consistent with a meniscus tear than were the mechanics of the 1993 incident, a jury could well conclude Gillard's false statements denied Dr. Murphy material information which could provide additional evidence that Gillard's condition resulting in an award for temporary disability and medical benefits was not industrially related.

### 3. *Gillard's Prior Injuries Were Material to Apportionment*

Assuming Gillard was injured when struck by the cart on July 2, 1993, his misrepresentations were material because they withheld from Doctors Roland and Murphy information relative to the issue of apportionment. Dr. Roland unequivocally stated he did not assess whether to apportion any of Gillard's disability to prior injuries because Gillard had denied prior injuries, but that apportionment would have been an issue and absolutely required had Dr. Roland been aware of the severity of Gillard's 1987 injury.

Gillard claims Roland's testimony must be disregarded because apportionment is relevant only when the prior injury produced a labor-disabling condition, and proof of that condition may not be based on medical conjecture or surmise but instead requires medical evidence describing in detail the basis for apportionment. (*Ditler* v. *Workers' Comp. Appeals Bd.* (1982) 131 Cal.App.3d 803, 814 [182 Cal.Rptr. 839]; *Robinson* v. *Workers' Comp. Appeals Bd.* (1981) 114 Cal.App.3d 593, 604 [171 Cal.Rptr. 48].) Gillard asserts that Dr. Roland admitted he could not "know" whether Gillard suffered from disabilities or whether Gillard's meniscus was torn prior to July 2, 1993, and that these admissions show Dr. Roland's testimony about the relevancy of apportionment was purely conjectural and must be disregarded. However, the evidence, viewed most favorably to the judgment, shows Dr. Roland merely admitted he could not definitively know the status of Gillard's knee before his examination. Dr. Roland opined, however, that the severity of the 1987 knee injury required some apportionment based on

MRI's "vastly" improved between 1987 and 1994, and that a 1987 MRI might well miss detecting tears which a more modern machine might detect. Gillard's contention also overlooks the testimony that although the 1994 MRI detected a tear it could not pinpoint the date of that tear. The medical testimony stated a tear could result from degenerative forces without trauma. Therefore the fact a tear was detected does not invalidate the conclusion the tear either preexisted Gillard's employment or occurred at some time other than July 2, 1993.

(1) the ligament damage suffered in 1987, (2) the potential for deterioration of the meniscus tissue from an uncorrected knee injury, and (3) his medical opinion that Gillard's medial ligament injury carries with it a more than 50 percent probability it will be accompanied by a meniscus injury. Because apportionment is proper when the medical evidence shows a reasonable medical probability apportionment is appropriate (*Calhoun* v. *Workers' Comp. Appeals Bd.* (1981) 127 Cal.App.3d 1, 11 [179 Cal.Rptr. 198]), Dr. Roland's testimony adequately shows apportionment was an issue and Gillard's misrepresentations were therefore material.

Other evidence supports the conclusion apportionment would have been an issue. First, Dr. Wieseltier opined that the nature and severity of Gillard's 1987 knee injury would prevent its improvement without surgery, and that the stresses of ordinary walking from an unrepaired knee could result in further damage. Under these circumstances apportionment could have been an issue. (*King* v. *Workers' Comp. Appeals Bd.* (1991) 231 Cal.App.3d 1640, 1648 [283 Cal.Rptr. 98] [apportionment proper when medical evidence shows disability is result of natural progression of preexisting nonindustrial condition and disability would have occurred absent industrial injury].) Second, although Gillard claims there is no evidence of a disability, we note Gillard complained to Dr. Wieseltier in 1988 of "popping" and swelling of the knee, and that his knee cap "jump[ed] laterally" whenever he pivoted. Six years later Gillard complained to Dr. Murphy that his knee "pops," "gives way when [he] twist[s]," and swells. Because there is evidence Gillard's knee would not have healed absent surgery and his symptoms had remained consistent despite the passage of six years, a jury could conclude these same symptoms were in fact present on July 2, 1993, and in fact Gillard had a labor-disabling condition in 1993, making apportionment appropriate.[12]

---

[12]Gillard claims Dr. Wieseltier's testimony shows Gillard had no disability as of 1988. Although Dr. Wieseltier's final 1988 report impliedly found no permanent disability, it did state Gillard continued to experience "intermittent pain and occasional popping," which symptoms "increase with bending, running" and "decrease[] with inactivity," suggesting Gillard did have some disability at that time. Gillard claims Dr. Wieseltier provided evidence Gillard's injury could have healed without surgery and produced no pain by 1993. Gillard misreads Dr. Wieseltier's testimony. Dr. Wieseltier testified the *"brick-to-the-knee-type" injury would have healed*, although "only to the degree that [he] would achieve a pre-injury level in regard[] to his knee," but it was unlikely the type of knee injury sustained from the car accident would have healed without surgery. As to Gillard's being "pain free," Dr. Wieseltier testified Gillard would not have problems if he were leading a sedentary life but would experience persistent and worsening symptoms if he were regularly doing heavy work.

### C. *There Is Substantial Evidence to Support the Convictions on Counts One and Three*

#### 1. *Count Three: The Misrepresentation to Dr. Murphy*

Gillard argues his misrepresentation to Dr. Murphy was not material because Dr. Murphy concluded Gillard had no permanent disability to his right knee. Gillard reasons apportionment therefore never became germane to Dr. Murphy's report, and information of the preexisting knee condition was immaterial. We reject this argument. First, as discussed above, because Gillard's misrepresentation inhibited Dr. Murphy from discovering the true cause of Gillard's temporary disability, Gillard collected benefits to which he was not entitled if his problems were nonindustrial. ■ Second, materiality does not require that the omitted information in fact influence the ultimate determination of whether benefits are owed; it is material if it can influence the determination. Certainly, nondisclosure of the prior injury could have influenced the applicability of apportionment even though it ultimately did not.

#### 2. *Count One: The Initial Misrepresentation to Dr. Roland*

■ Gillard contends that because his injury was not permanent and stationary on October 13, 1993, any misrepresentations to Dr. Roland on that date as to his prior injuries were as a matter of law immaterial because apportionment becomes relevant only when an injury becomes permanent and stationary and the worker has a residual permanent disability. However, even before an injury becomes permanent and stationary, industrial causation is relevant to temporary benefits, and Gillard's concealment of his prior injuries effectively forced Dr. Roland to attribute Gillard's temporary disability to industrial rather than preexisting causes. Furthermore, the misrepresentation is material if it can influence the determination, even though it does not. Gillard's failure to disclose the existence of his prior knee injury could have influenced the applicability of apportionment even though Dr. Roland's ignorance of the prior injury resulted in his conclusion that apportionment was not appropriate.

### D. *Substantial Evidence Supports the Perjury Conviction*

■ Gillard contends the perjury conviction should be reversed because he admitted in his testimony at the 1994 WCAB hearing he had been involved in the 1987 car accident. A perjury conviction requires that Gillard, while under oath in a competent tribunal, willfully stated as true any material matter he knew to be false. (Pen. Code, § 118.) Gillard testified under oath at

the WCAB hearing and admitted the 1987 accident. However, he specifically denied suffering any injury to his right knee in that accident, knowing his denial to be false. Moreover, his false statement was material to the issues before the WCAB because it might have affected apportionment even though it ultimately did not. (Pen. Code, § 123.)

Gillard also contends it was improper to convict him of perjury merely because he was not specific about the injuries he suffered in the 1987 car accident.[13] Gillard's perjury conviction is not for providing incomplete answers, but for providing false information to direct questions.

E. *The Prosecution Was Not Collaterally Estopped From Seeking to Prove Gillard Was Not Injured at the Fair*

■ Gillard contends that because the workers' compensation judge concluded Gillard did suffer a work-related injury at the Fair in 1993, the prosecution was collaterally estopped from relitigating whether he was injured and if so how the injury occurred. From this premise, Gillard claims it was error to admit evidence of the accident in which he was injured and of the injuries allegedly incurred in the accident.

We reject Gillard's argument. The elements of collateral estoppel are not present. ■ Those elements are: (1) the issue sought to be precluded from relitigation is identical to that decided in the former proceeding; (2) the issue was actually litigated and necessarily decided in the former proceeding; and (3) the party against whom preclusion is sought was a party, or in privity with a party, to the former proceeding. (*Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341, fn. 3 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995].) ■ Here "issue identity" appears absent because the issue in the criminal trial was whether Gillard made materially false statements, not whether Gillard suffered a compensable injury.[14] Further, the party identity element is absent. Gillard's adversary in the WCAB proceeding was Gillard's employer, the 22nd District Agricultural Association. The 22d District Agricultural Association, which operates the Fair, is a state agency but is not a part of the executive branch. (3 Ops.Cal.Atty.Gen. 263,

---

[13]Gillard claims he also testified at the WCAB hearing that he had been hospitalized as a result of the 1987 car accident. However, Attorney Feagles, who cross-examined Gillard in the WCAB hearing, stated Gillard admitted he went to the hospital after being banged in the knee in a 1992 car accident, not in connection with the 1987 car accident.

[14]Indeed, Gillard's argument appears to assert that a worker who successfully obtains benefits based on false representations could never be prosecuted because the judgment awarding benefits would collaterally estop the prosecution from proving the worker was not entitled to those benefits. We do not interpret section 1871.4 as becoming moot if the fraud succeeds.

264 (1944).) In contrast, Gillard's adversary in the criminal proceeding was the San Diego County District Attorney's Office, a county agency which is a member of the executive branch. (*People* v. *Sims* (1982) 32 Cal.3d 468, 487 [186 Cal.Rptr. 77, 651 P.2d 321].) We doubt whether these two entities have a sufficiently close association to permit "party identity" to be shown.

Assuming the elements of collateral estoppel were present, collateral estoppel must be raised in the trial court by a timely objection (*Ponce* v. *Tractor Supply Co.* (1972) 29 Cal.App.3d 500, 508 [105 Cal.Rptr. 628]; *People* v. *Beltran* (1949) 94 Cal.App.2d 197, 207 [210 P.2d 238]) and is waived if not raised below (*Ponce* v. *Tractor Supply Co.*; *Dimmick* v. *Dimmick* (1962) 58 Cal.2d 417, 422-423 [24 Cal.Rptr. 856, 374 P.2d 824]). Gillard cites nothing to show collateral estoppel was asserted below, and we deem Gillard's collateral estoppel argument to have been waived.

## F. *The Trial Court Did Not Abuse Its Discretion by Admitting Evidence of Gillard's Prior Injuries*

Gillard claims it was error to allow introduction of his prior injuries into evidence because without proof showing the prior injuries resulted in fraudulent claims, they were irrelevant.

Evidence Code section 1101, subdivision (a) prohibits introduction of prior conduct to prove conduct on a particular occasion, but Evidence Code section 1101, subdivision (b) permits introduction of prior conduct if relevant to prove some other disputed material fact. Admissibility under subdivision (b) depends on the materiality of the fact sought to be proved, the tendency of the evidence to prove or disprove the disputed fact, and any rule or policy requiring exclusion of the evidence. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 171 [276 Cal.Rptr. 679, 802 P.2d 169].) Materiality is present if the fact is either an ultimate fact or an intermediate fact from which an ultimate fact can be inferred, and the ultimate fact is actually in dispute. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].) The second element requires a factual examination of similarities between the charged conduct and the prior conduct to determine whether the prior conduct " ' "logically, naturally, and by reasonable inference" ' " establishes the disputed fact. (*Id.* at p. 316.)

The prosecution offered the prior conduct evidence to show Gillard had a common scheme or plan and a lack of accident or mistake. In *People* v. *Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757], the court evaluated the admissibility of prior conduct evidence. The *Ewoldt* court noted the degree of similarity varies depending on the issue sought to

be proved by the prior conduct evidence. The least degree of similarity is required when the issue to be proved is whether the defendant harbored the requisite intent for the charged crime, because the recurrence of similar results tends increasingly to negate accident or inadvertence or self-defense or other innocent mental states, and instead tends to show the presence of the criminal intent which normally accompanies criminal acts. (*Id.* at p. 402.)

 A greater degree of similarity is required when the prior conduct evidence is used to establish a common scheme or plan. In this context the evidence must show more than merely similar results. Instead, there must be such a concurrence of common features that the various acts can be explained as being caused by a general plan of which events are but individual manifestations. The common features must show the existence of a plan rather than a series of spontaneous acts, but the plan revealed need not be distinctive or unique. (*People* v. *Ewoldt, supra,* 7 Cal.4th at pp. 402-403.)

 Applying the foregoing standards here, we conclude the prior conduct evidence was admissible under Evidence Code section 1101, subdivision (b).

Gillard's not guilty plea placed in issue all of the elements of the offense, including his intent in committing the charged offense. (*People* v. *Balcom* (1994) 7 Cal.4th 414, 422 [27 Cal.Rptr.2d 666, 867 P.2d 777].) The fact that Gillard concealed a series of injuries, including the serious injuries incurred in the 1987 car accident, when he sought workers' compensation benefits from Allied Builders and from McDowell, was admissible to show that his concealment of his prior injuries on this occasion was not an atypical mistake or inadvertent omission but was part of a consistent pattern of concealment. (*People* v. *Singh* (1995) 37 Cal.App.4th 1343, 1380-1381 [44 Cal.Rptr.2d 644].) Additionally, even if some or all of Gillard's pre-1988 injuries were legitimate, "although remarkably unlucky given their number, the [prior injuries] could have provided the experience upon which [Gillard] later relied to construct and enact his fraudulent scheme." (*Id.* at p. 1381.) There was no error in admitting the prior accidents and injuries to show Gillard's intent and whether Gillard had a scheme to defraud insurers.

G. *The Bulk of the Material From Attorneys Montegna and Kiwan Was Not Privileged, and Admission of the Photographs Was Harmless Error*

Gillard contends the trial court erroneously overruled his objections, which were based on attorney-client privilege, to: (1) the testimony elicited from Attorneys Montegna and Kiwan, and (2) the admission of documents obtained from Attorney Montegna's files.

### 1. The Testimony Did Not Involve Privileged Material

The testimony of Attorney Kiwan, who represented Gillard on his claim against the Fair, did not include information protected by the attorney-client privilege. Kiwan testified he represented Gillard in connection with the claim against the Fair and during those proceedings Gillard denied any injury to his right knee except for the 1987 Allied Builders claim. Because this information was of public record no confidential information was elicited by the prosecution which violated the attorney-client privilege.[15] Gillard does not argue or provide authority suggesting how the only other information elicited by the prosecution—what records Kiwan had obtained from Dr. Dentice—was privileged, and we deem the argument waived. (*Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

The testimony of Attorney Montegna, retained by Gillard to represent him in the 1987 car accident case, included no confidential communications. The only information the prosecution elicited was a description of various documents contained in Montegna's client file generated in 1987. Montegna was never asked about his confidential discussions with Gillard.

### 2. Admission of the Photographs Was Harmless Error

Although Montegna did not testify to any privileged communications, his file was admitted as an exhibit. The file contained photographs of Gillard taken by Montegna's investigator.[16] Because these photographs appear to have been taken to convey confidential information from Gillard to

---

[15]Kiwan was asked about privileged communications when the court inquired whether Kiwan had asked Gillard about his prior injuries and whether Kiwan nevertheless was ignorant of the 1987 knee injury. However, this questioning followed the questions Gillard's attorney posed about whether during Kiwan's meetings with Gillard Kiwan had difficulty obtaining information from Gillard or found Gillard's recall of historical facts deficient. When, as here, the client's adversary limits his questions of a former attorney to nonprivileged material but the client through his current attorney then questions the former attorney concerning privileged discussions, the privilege is waived as to those discussions and the former attorney may be cross-examined about those matters. (*Winegar* v. *Gray* (1962) 204 Cal.App.2d 303, 310-311 [22 Cal.Rptr. 301]; *People* v. *Dubrin* (1965) 232 Cal.App.2d 674, 680 [43 Cal.Rptr. 60].)

[16]Gillard does not explain how the balance of the material in Montegna's file was privileged. For example, the file contained a police report of the accident (a public record and not privileged) and a preprinted release of medical records and lien form apparently containing no confidential communications. Because Gillard does not assert that anything other than the photographs were privileged, we deem waived any implied claim that any part of the remaining paperwork was privileged. (*Troensegaard* v. *Silvercrest Industries, Inc., supra,* 175 Cal.App.3d 218.)

his attorney, the photographs are privileged.[17] (*Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 508 [267 P.2d 1025], disapproved on another point in *Suezaki* v. *Superior Court, supra*, 58 Cal.2d at p. 176.)

The trial court overruled Gillard's objection to the introduction into evidence of the photographs because: (1) the photographs would not have been privileged had Gillard filed a personal injury lawsuit in 1987 involving the car accident and therefore were not privileged even though no lawsuit was ever filed; and (2) Gillard placed his physical condition in issue when he brought the workers' compensation claim against the Fair and waived any privilege he might have had regarding the photographs. Both grounds appear to be based on the same premise: When privileged communications are directed to an attorney concerning issues later tendered in a lawsuit by the client, the client effectively waives the privilege. However, on appeal the People candidly concede these grounds were error, because a plaintiff's personal injury claim that waives the physician-patient privilege does not waive the attorney-client privilege with respect to discussions or communications about that injury. (*People* v. *Lines* (1975) 13 Cal.3d 500, 511-513 [119 Cal.Rptr. 225, 531 P.2d 793].)

Although the photographs were privileged and the trial court erroneously admitted them into evidence, we are convinced it is not reasonably probable a jury would have rendered a more favorable verdict even if the evidence had been excluded. (*People* v. *Clark* (1990) 50 Cal.3d 583, 623 [268 Cal.Rptr. 399, 789 P.2d 127].) The evidence overwhelmingly showed that Gillard falsely denied having any prior knee injury, and the photographs were at most cumulative to other properly admissible evidence, including the reports of Doctors Hansen and Gilligan and the file of Dr. Dentice, showing Gillard had suffered a severe knee injury in the 1987 car accident. We are convinced the knee injuries described by Doctors Hansen, Gilligan and Dentice amply proved the severity of the 1987 knee injury, and it is not reasonably probable that exclusion of the pictorial depictions of that injury would have resulted in a different verdict.

---

[17]Respondent cites *Suezaki* v. *Superior Court* (1962) 58 Cal.2d 166 [23 Cal.Rptr. 368, 373 P.2d 432, 95 A.L.R.2d 1073] as holding photographs are not within the attorney-client privilege. However, *Suezaki* is inapposite because the issue in *Suezaki* was whether photographs of the plaintiff, taken by defense investigators and conveyed to defense counsel, were privileged. The court concluded they were not privileged because a photograph of a plaintiff which is given to his adversary's counsel is not a communication from a client to *his* attorney—a prerequisite for the privilege to attach. (*Id.* at pp. 176-177.) Unlike in *Suezaki*, the photographs of Gillard were communicative to Gillard's counsel.

## H. *Gillard Is Not Entitled to Seek Recusal Under the Circumstances of This Case*

Gillard asserts that because the prosecution obtained possession of materials protected by the attorney-client privilege, the appropriate remedy is to recuse the prosecutor's office. Gillard argues we must remand in order to determine what portion of the prosecutor's case was developed based on its receipt of privileged materials.

### 1. *Kiwan's File*

The record shows that a search warrant was served on Kiwan's office, and that his client file on Gillard was obtained pursuant to Penal Code section 1524. However, pursuant to that section, the file was sealed by a special master at the time of seizure and was held under seal to allow Gillard to file a motion to suppress or to seek return of the materials under section 1524, subdivision (c)(2). No motion or objection was filed and the file was released to the prosecution. Because the record contains no indication Gillard interposed a timely objection or motion to suppress to prevent release of that file, we conclude any privilege which might have attached to those materials is deemed waived. (Evid. Code, § 912, subd. (a).) Because Gillard's inaction waived the privilege and permitted the prosecutor to obtain Kiwan's file, Gillard may not now argue the prosecutor must be recused based on alleged evidence the prosecutor developed from Kiwan's file.

### 2. *Montegna's File*

Gillard apparently timely objected to release of Montegna's file. In response to a subpoena duces tecum, Montegna delivered that file to the municipal court in connection with Gillard's preliminary hearing, asserted the materials were privileged, and requested the materials be held in camera pending a determination of privilege. At the preliminary hearing Gillard's counsel asserted the documents were privileged, but the court ruled the documents would be released because the privilege did not apply under the "crime or fraud" exception to the attorney-client privilege. (Evid. Code, § 956.)

Although Gillard's objection to release was preserved, we are convinced remand is unnecessary because our review of that file demonstrates that the only privileged information within it was the photographs. Gillard does not suggest the prosecutor learned anything from those photographs which he would not have learned from the nonprivileged reports of Doctors Hansen and Gilligan. Therefore remand would be an idle act.

I. *Remand for Resentencing Is Necessary Under Romero*

Gillard contends remand for resentencing is necessary because the court was unaware of its discretion described in *People* v. *Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628] to strike one or more of the prior strikes.[18] The trial court's comments suggest it might well have exercised its discretion to reduce Gillard's sentence if it had the power to do so. Remand is necessary to allow the court to decide whether to exercise its discretion under *Romero* to impose a less severe sentence by striking one or both of the prior strike allegations. (See *People* v. *Sotomayor* (1996) 47 Cal.App.4th 382, 391 [54 Cal.Rptr.2d 871].)

DISPOSITION

The matter is remanded for resentencing in accordance with the guidelines set forth in *Romero*; in all other respects the judgment is affirmed.

Kremer, P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 10, 1997.

---

[18]Gillard also argues we must reverse the order awarding $27,000 as restitution to the victim. However, the probation officer's report placed Gillard on notice of an order for "victim restitution" being sought and the amount of and basis for the requested order. Gillard raised no objection at trial to the order, and he may not complain of the order for the first time on appeal. (*People* v. *Forshay* (1995) 39 Cal.App.4th 686, 689 [46 Cal.Rptr.2d 116]; *People* v. *Gibson* (1994) 27 Cal.App.4th 1466, 1468-1469 [33 Cal.Rptr.2d 217].)