Filed 5/12/16  P. v. Lopez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CHANY LOPEZ,<br><br>        Defendant and Appellant. | D068570<br><br><br>(Super. Ct. No. SCD255319) |

APPEAL from a judgment of the Superior Court of San Diego County, Joseph P. Brannigan, Judge.  Affirmed.

Steven J. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Chany Lopez of four felony counts of unlawfully making a knowingly false and fraudulent statement in violation of Insurance Code section 1871.4, subdivision (a)(1) in connection with his filing of a workers' compensation claim. The court sentenced defendant to three years' formal probation, including 180 days in custody in a work furlough program.

On appeal, defendant contends the court erred in instructing the jury, in denying his motion for acquittal under Penal Code section 1118.1, and in refusing to reduce his felony convictions to misdemeanors. He further contends the evidence is insufficient to support his convictions. As we explain, we disagree with each of his contentions and affirm the judgment of conviction.

FACTUAL OVERVIEW

In 2009, defendant was an employee of the San Diego Unified School District (district). In late November 2009, while driving a district truck, defendant was sideswiped. Although defendant complained to coworkers that he was injured in the accident, he then declined any medical treatment and the matter was handled internally by the district.

A. *Count 1*

In June 2011, defendant submitted a workers' compensation claim for pain in his neck and lower back arising from the November 2009 accident. Third party administrator York Risk Services (York) opened a file and sent defendant to Dr. Spencer Olsen, a physician in occupational medicine. Dr. Olsen treated defendant on June 10,

2

2011.[1] In connection with that consultation, defendant filled out a "health history questionnaire," which Dr. Olsen noted sought information about "past medical history, current conditions [and] past treatment."

Dr. Olsen testified that he also went over defendant's medical history with defendant and completed a separate medical history at the same time; that he asked defendant if he had suffered any "previous occupational injuries or illnesses" and that defendant replied, "no," corresponding to the box then checked by Dr. Olsen; that he also asked if defendant had "any preexisting conditions that complicate or prolong [defendant's] diagnosis or treatment" and that defendant again replied, "no," again corresponding to the box checked by Dr. Olsen; and that Dr. Olsen also wrote a "zero with a slash through it" to confirm defendant had "basically no[]" past medical history.

Dr. Olsen opined that defendant's back and neck pain were caused by arthritis and not by the November 2009 car accident. Dr. Olsen reached this conclusion based on X-rays of defendant that, in Dr. Olsen's opinion, showed arthritis "diffusely spread throughout [defendant's] spine."

B. *Count 2*

After defendant's consultation with Dr. Olsen, York hired Enduro International PI Incorporated (Enduro) to investigate whether defendant's injury was work related. In connection with that investigation, typically an "AOE/COE" interview is done. Private

---

1    The record shows Dr. Olsen repeatedly testified on direct examination that he treated defendant on November 29, 2009, which was the day of the accident. Dr. Olsen subsequently clarified that he actually treated defendant on June 10, 2011, which is consistent with other portions of the record including the felony complaint.

Investigator Kenneth Grimes, who at all times relevant worked for Enduro, testified "AOE" means "arising out of employment" and "COE" means "in the course of employment."

Grimes testified that he conducted an AOE/COE interview with defendant on July 7, 2011; that the interview took place at a district office; that typically these interviews were recorded but that defendant requested his interview not be recorded; and that during the interview, defendant's supervisor was present. Before the interview began, Grimes told defendant it was important to tell the truth.

After defendant gave his statement, Grimes mailed defendant a copy of the report. Grimes instructed defendant to review the report to make sure it was accurate; to initial each page of the report; and to sign the last page. Grimes, however, never received anything back, or heard, from defendant.

Grimes testified that during the AOE/COE interview, he separately asked defendant if he had *ever* sustained a prior neck *or* back injury and that defendant responded "no" to both questions. Grimes also asked defendant if he had *ever* made any prior liability claims. Defendant again responded "no." Grimes next asked defendant if he had filed a prior workers' compensation claim, and again defendant said "no." Grimes testified defendant then denied knowing anything about the workers' compensation system and denied he had been through the process of filing a claim before the November 2009 accident.

4

C. *Count 4*[2]

On November 29, 2011, defendant consulted with an orthopedist, Dr. John Lane, concerning neck and back pain. In response to Dr. Lane's question whether he had any previous work injuries including to his lower back, defendant replied "no." Defendant also denied having any previous non-work-related injuries. After his examination, Dr. Lane's diagnostic impressions of defendant were a cervical strain in the neck region and a mild to moderate multi-level stenosis of the lumbar spine.

Dr. Lane saw defendant on March 20, 2012, when Dr. Lane prepared a permanent and stationary report dated that same day. Dr. Lane testified that when a person sustains a work injury, under California's workers' compensation system such a report is necessary to provide for permanent work restrictions, if any, and for "impairment for which people get compensated for the injury"; "to outline the need for future medical care"; and to address "apportionment." Dr. Lane gave defendant a 0 percent "whole person impairment" for his cervical spine and 11 percent for his lumbar spine. Dr. Lane noted a "whole person impairment" refers to a percentage rating of a person's disability that is used in California's workers' compensation system to determine benefits.

Dr. Lane next completed an apportionment of defendant's workers' compensation injury with respect to the lumbar spine injury. Dr. Lane noted that defendant did have some "degenerative changes" in the lumbar spine and that, "in the *absence of any prior*

---

2 Following the presentation of evidence by the People, the court dismissed count 3, which involved a consultation with another doctor on or about October 6, 2011. (See Pen. Code, § 1118.1.)

*injury*, it was [his] opinion that 10 percent of his impairment would be due to some of the underlying degenerative changes with 90 percent being due to work aggravation." (Italics added.)

During a background search of defendant that included subpoenaed records, York found defendant had in fact submitted the following workers' compensation claims when employed by the City of San Diego (City): 1) May/June 1991 for left shoulder, left arm *and* upper back; 2) March 1993 for low back and both legs; and 3) January 1996 for low back. Defendant's prior medical history was important because it affected the apportionment calculation of benefits. That is, if a person had no prior injury, then there would be no apportionment and that person would receive the entire sum based on his or her permanent disability.

York asked Dr. Lane to review this additional information and provide, if necessary, a supplemental report including on the issue of apportionment. Dr. Lane testified that he spent more than 22 *hours* reviewing the additional records provided by York.

Dr. Lane in his December 15, 2013 supplemental report revised his opinions on defendant's whole person impairment and apportionment based on his review of the additional information provided by York. Dr. Lane determined in his supplemental report that defendant had a 13 percent whole person impairment and that 61.5 percent of his award was due to his prior injury and 38.5 percent was due to his subsequent injury. Defendant's benefits were reduced accordingly.

6

D. *Count 5*

In late April 2012, defendant called Daveena Harris, a York employee and senior claim's examiner, regarding the status of his 2011 workers' compensation claim. Harris testified that at the outset, defendant told Harris she did not have permission to record the call. During the call, defendant complained he was not being treated fairly by York.

Harris testified she specifically asked defendant during that phone call if he had *ever* sustained a work-related injury and if he had *ever* submitted a workers' compensation claim from any employer. According to Harris, defendant responded "no" to both questions.

DISCUSSION

I

*Instructional Error*

Defendant contends the court erred when it failed sua sponte to instruct the jury correctly in defining the elements of workers' compensation fraud in connection with his convictions in counts 1, 2, 4 and 5. Specifically, he contends that Insurance Code section 1871.4, subdivision (a)(1) requires the People to show that defendant, as opposed to the insurer, knew his alleged misstatements were *material.* We disagree.

Insurance Code section 1871.4, subdivision (a)(1) provides in relevant part that it is unlawful to "[m]ake or cause to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code."

The record shows the court instructed the jury as follows:

7

"The defendant is charged in Counts 1, 2, 4 and 5 with making a [f]alse or [f]raudulent [s]tatement in violation of Insurance Code section 1871.4(a)(1). [¶] Every person who makes or cause[s] to be made any knowing false or fraudulent material statement or material representation for the purpose of obtaining or denying any workers' compensation benefits is guilty of a violation of section 1871.4(a)(1) of the Insurance Code. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant made or caused to be made a written or oral statement or representation; [¶] 2. The defendant knew the statement or representation was false or fraudulent; [¶] 3. The false or fraudulent statement or representation was material; [¶] AND [¶] 4. The false or fraudulent statement or representation was made with the specific intent to obtain any compensation or benefit under the Workers' Compensation Act. [¶] Compensation under the Workers' Compensation Act includes every Workers' Compensation benefit or payment conferred upon an injured employee, including vocational rehabilitation. [¶] A statement or representation is material if it concerns a subject reasonably relevant to the insure[r]'s investigation, and if a reasonable insurer would attach importance to the fact represented.  A statement is material even if it does not influence the ultimate decision to award benefits.  The statement is material if it probably could have influenced the decision to award benefits. [¶] *The People do not need to prove that the defendant knew that the information in his statement was material*."  (Italics added.)

Here, we conclude the court properly instructed the jury on the elements of this offense.  An instruction on materiality under Insurance Code section 1871.4, subdivision

8

(a)(1) is adequate if it informs the jury that the false or fraudulent statement was "reasonably relevant" to the *insurer's* investigation. (*People v. Gillard* (1997) 57 Cal.App.4th 136, 152 (*Gillard*).) That is, because it is the insurer who is paying the benefit, if any, it follows that the determination of materiality depends on whether a reasonable insurer, as opposed to a defendant insured, would attach importance to the fact represented. (See *ibid.*)

The record shows the jury was properly instructed that it had to find beyond a reasonable doubt that defendant knowingly made a false or fraudulent statement under Insurance Code section 1871.4, subdivision (a)(1), for purposes of obtaining workers' compensation benefits arising from the November 2009 accident. (Compare *People v. Simon* (1995) 9 Cal.4th 493, 522 [imposing a knowledge and scienter requirement in connection with Corporations Code section 25401, which, unlike Insurance Code section 1871.4 at issue here, did *not* expressly require knowledge of the false or misleading nature of a statement or omission to disclose as an element of the unlawful act it defined].)

Moreover, as we have just found, the jury was properly instructed that the false or fraudulent statement must be material—viewed from the perspective of an insurer—and that, when defendant made the statement, he had the specific intent to obtain workers' compensation benefits. (See *People v. Dieguez* (2001) 89 Cal.App.4th 266, 279 [rejecting contention court had a sua sponte duty to instruct on the element of specific intent to defraud for purposes of obtaining workers' compensation benefits because the " 'intent to defraud the insurer is necessarily implied when the misrepresentation is

9

material and the insured willfully makes it with knowledge of its falsity' "].)  As such, we reject defendant's instructional error contention.[3]

## II

### *Sufficiency of the Evidence*

Defendant next contends the court erred in denying his motion for judgment of acquittal under Penal Code section 1118.1 in connection with counts 1 and 2 because Dr. Olsen ultimately determined defendant's pain was due not to the November 2009 car accident, but instead to degenerative arthritis.  Because count 2 related to private investigator Grimes's AOE/COE interview arising out of count 1, defendant contends both counts should have been dismissed because "any omission of information of prior claims was irrelevant and not material."  We disagree.

It is beyond dispute that the materiality of a statement for purposes of Insurance Code section 1871.4, subdivision (a)(1) "is *not* defined and determined by the effect it has on the outcome of the investigation" (see *Cummings v. Fire Ins. Exch.* (1988) 202 Cal.App.3d 1407, 1416 (*Cummings*), italics added), but rather by "its *prospective* reasonable relevance to the *insurer's* inquiry" (see *id.* at p. 1417, italics added).  Thus, "a statement is not material only if it relates to a matter which ultimately proves to be significant in the ultimate disposition of the claim.  *Rather, if the misrepresentation concerns a subject reasonably relevant to the insure[r]'s investigation, and if a*

---

[3]    In light of our decision, we deem it unnecessary to address (1) whether defendant received ineffective assistance of counsel when defense counsel failed to object to this instruction; or (2) the People's related contention that the failure to object forfeited this issue on appeal.

10

*reasonable insurer would attach importance to the fact misrepresented, then it is material.*" (*Ibid.*, citing *Fine v. Bellefonte Underwriters Ins. Co.* (2d Cir. 1984) 725 F.2d 179, 182-184.)

Here, viewing the record as a whole in the light most favorable to the judgment, as we must (see *People v. Houston* (2012) 54 Cal.4th 1186, 1215), we conclude there is sufficient evidence to support the finding that defendant's false statements to Dr. Olsen—that he had no "previous occupational injuries or illnesses" or "preexisting conditions that complicate or prolong [his] diagnosis or treatment"—were "reasonably relevant" to York's investigation of defendant's workers' compensation claim. (See *Cummings*, *supra*, 202 Cal.App.3d at p. 1417.) Indeed, the record shows defendant, while employed by City, filed three claims in the 1990's, each of which in some measure involved his back.

We further conclude there is sufficient evidence in the record to support the finding that a reasonable insurer such as York would attach significance to the false statements made by defendant regarding both past claims he submitted and his past medical history. (See *Cummings*, *supra*, 202 Cal.App.3d at p. 1417.)

We reach the same conclusion with respect to defendant's separate statements to Grimes, who was investigating whether defendant's injuries arising from the November 2009 accident were work related. As summarized *ante*, Grimes testified that he specifically told defendant it was important to tell the truth; that he specifically asked defendant if he had *ever* sustained a prior neck *or* back injury; and that defendant responded "no" to both questions. In addition, defendant also told Grimes he had not filed any prior workers' compensation claims.

11

In light of the evidence in the record that defendant had in fact filed three prior claims and that such claims also involved in some measure a back injury, we conclude there is sufficient evidence in the record to support the finding that defendant's false statements to Grimes concerned a subject "reasonably related" to York's investigation of defendant's 2011 claim and that a reasonable insurer such as York would attach importance to such false statements. (See *Cummings*, *supra*, 202 Cal.App.3d at p. 1417.)

III

*Separate Convictions on Counts 4 and 5*

Defendant next contends count 5, which related to his April 2012 statements to Harris that he had never filed a workers' compensation claim or sustained a work-related injury before the November 2009 accident, should have been dismissed pursuant to Penal Code section 1118.1. Defendant contends his statements to Harris were related to Dr. Lane's November 29, 2011 examination, which was the subject of count 4. Because counts 4 and 5 involved the same investigation, defendant contends count 5 was redundant of count 4. We disagree.

We note in making this argument, defendant is unable to cite any authority to support his contention that count 5 should have been dismissed because it allegedly was related to the same investigation involving count 4. In any event, the plain language of Insurance Code section 1871.4, subdivision (a)(1) does not support defendant's contention, as it makes unlawful "a knowingly false or fraudulent material *statement* or material *representation* for the purpose of obtaining" workers' compensation benefits. (Italics added.) Thus, the plain language of the statute defines the offense not in terms of

12

an investigation, but rather in terms of a "statement" or "representation." (See *People v. Dunbar* (2012) 209 Cal.App.4th 114, 117 [noting " '[w]hen interpreting statutes, we begin with the plain, commonsense meaning of the language used by the Legislature' " and further noting " '[i]f the language is unambiguous, the plain meaning controls' "].)

Here, the record shows defendant made two separate statements on two different occasions to two different individuals concerning his 2011 workers' compensation claim. Indeed, as noted, defendant denied having any prior work-related injuries, including to his back, when he consulted with Dr. Lane in late November 2011, when in fact the opposite was true.

The record further shows defendant in late April 2012 unilaterally contacted Harris regarding the status of his workers' compensation claim. During the course of that conversation, he again denied *ever* suffering any work-related injury or making any workers' compensation claims based on any such injury or injuries in response to specific questions posed by Harris. Under Insurance Code section 1871.4, subdivision (a)(1), we thus conclude the false statements defendant separately made to Dr. Lane and Harris each constituted a separate offense.

IV

*Multiple Convictions Arising from Defendant's 2011 Workers' Compensation Claim*

Defendant contends he should only be found guilty of one felony count for making false or fraudulent statements in connection with his 2011 workers' compensation claim because, even assuming his omissions were material, there allegedly was only one victim—the district—and there was only one claim for workers' compensation benefits.

13

In support of this contention, defendant relies on *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), as recently explained by *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*).

In *Whitmer*, the defendant was convicted of 20 counts of grand theft for 20 separate fraudulent sales while working as the manager of a motorcycle dealership. The issue in *Whitmer* was whether the defendant was properly convicted of a separate theft for each vehicle fraudulently sold, or whether he could be convicted of only one count of grand theft because all of the sales were part of a single scheme. Although our high court reexamined *Bailey*, which merely involved the aggregation of separate petty thefts to constitute a single grand theft, and determined that the defendant manager could be properly convicted of multiple counts of grand theft even if committed pursuant to a single overarching scheme, it refused to apply that new rule retroactively. (*Whitmer*, *supra*, 59 Cal.4th at p. 735.) Thus, "for this reason only," the *Whitmer* court reversed the judgment of conviction for the 20 counts of grand theft. (*Ibid.*)

We conclude *Whitmer* (and *Bailey*) do not apply to the instant case. First, both of these cases involved theft and/or grand theft, not workers' compensation fraud. Second, *Whitmer* noted that *Bailey* "concerned a single fraudulent act followed by a series of payments [to a defendant by the welfare office]." (*Whitmer*, *supra*, 59 Cal.4th at p. 740.) Here, in contrast, defendant on four separate occasions made knowingly false statements to four separate individuals in connection with his 2011 workers' compensation claim. As we have found, under the plain language of Insurance Code section 1871.4, subdivision (a)(1), each false statement constituted a separate offense.

14

Third, even though distinguishable, *Whitmer* itself recognized that a "serial thief should not receive a ' "felony discount" ' if the thefts are separate and distinct even if they are similar." (*Whitmer*, *supra*, 59 Cal.4th at pp. 740-741.) As such, the *Whitmer* court concluded a "defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.) Here, counts 1, 2, 4 and 5 involved "separate and distinct" statements made by defendant to four different individuals at four different times pursuant to his "single overarching scheme" to obtain workers' compensation benefits arising from the November 2009 accident. (See *Whitmer*, at p. 741.) Thus, for this separate reason, we reject defendant's contention he should stand convicted of only one felony offense in this case.

V

*Reduction of Felony Convictions to Misdemeanors*

Lastly, defendant contends the court abused its discretion when it refused under Penal Code section 17, subdivision (b)[4] to reduce his felony convictions to misdemeanors.

---

4    As relevant here, subdivision (b) of Penal Code section 17 provides: "When a crime is punishable, in the discretion of the court, either by imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170, or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances: [¶] (1) After a judgment imposing a punishment other than imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170.  [¶ ]. . . [¶]  (3) When the court grants probation to a defendant without imposition of sentence and at the time of granting

"It is the Legislature's function ' "to define crimes and prescribe punishments . . . ." [Citation.]' [Citation.] The Legislature has classified most crimes as *either* a felony or a misdemeanor, by explicitly labeling the crime as such, or by the punishment prescribed. 'A felony is a crime that is punishable with death, [or] by imprisonment in the state prison . . . . Every other crime or public offense is a misdemeanor except those offenses that are classified as infractions.' ([Pen. Code,] § 17, subd. (a).) There is, however, a special class of crimes involving conduct that varies widely in its level of seriousness. Such crimes, commonly referred to as 'wobbler[s]' [citation], are chargeable or, in the discretion of the court, punishable as either a felony *or* a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail and/or by a fine. ([Pen. Code,] § 17, subd. (b) . . . .)" (*People v. Park* (2013) 56 Cal.4th 782, 789, fn. omitted.)

Assuming arguendo that Insurance Code section 1871.4, subdivision (a)(1) is a wobbler offense that is subject to reduction to a misdemeanor under subdivision (b) of Penal Code section 17, the question becomes whether the court properly exercised its broad discretion when it refused to reduce defendant's felony convictions in counts 1, 2, 4 and 5 to misdemeanors.

" 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a

---

probation, or on application of the defendant or probation officer thereafter, the court declares the offense to be a misdemeanor."

16

showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]

"We find scant judicial authority explicating any criteria that inform the exercise of [Penal Code] section 17(b) discretion. [Citation.] However, since all discretionary authority is contextual, those factors that direct similar sentencing decisions are relevant, including 'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his [or her] traits of character as evidenced by his [or her] behavior and demeanor at the trial.' [Citations.] When appropriate, judges should also consider the general objectives of sentencing such as those set forth in California Rules of Court, rule 410.[5]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978 (*Alvarez*).)

---

5 California Rules of Court, rule 4.410 provides: "(a) General objectives of sentencing include: [¶] (1) Protecting society; [¶] (2) Punishing the defendant; [¶] (3) Encouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses; [¶] (4) Deterring others from criminal conduct by demonstrating its consequences; [¶] (5) Preventing the defendant from committing new crimes by isolating him or her for the period of incarceration; [¶] (6) Securing restitution for the victims of crime; and [¶] (7) Achieving uniformity in sentencing. [¶] (b) Because in some instances these objectives may suggest inconsistent dispositions, the sentencing judge must consider which objectives are of primary importance in the particular case. The sentencing judge should be guided by statutory statements of policy, the criteria in these rules, and the facts and circumstances of the case."

Here, the record shows that at sentencing the defense asked the court to reduce defendant's four felony convictions to misdemeanors because defendant was the "sole breadwinner" of his family; he had been an honest and hard-working district employee for more than 15 years; he had no criminal history for almost 30 years up until the latest convictions; and if his convictions were not reduced to misdemeanors, it would be difficult, if not impossible, for him to remain employed by district.

The prosecutor, on the other hand, contended defendant's convictions should remain as felonies. The prosecutor noted that the district spent about $26,000 investigating and uncovering defendant's fraudulent conduct; that although defendant received only about $3,000 in benefits, if the fraud had not been discovered defendant likely would have received much more money; that while many people may believe insurance fraud is "insignificant," the fact is it is a significant crime because an employee is "picking the pockets of [his or her] employer"; and that, most concerning, defendant still did not believe he had done anything wrong, as shown by the probation report.

The probation report noted that defendant on May 26, 2014 showed up for an interview without an appointment and that, during the interview, he repeatedly claimed to have been " 'wrongfully convicted.' " According to the probation report, defendant "maintained he is the victim in this case and he does not consider the insurance company or [the district] to be victims. The defendant stated, 'the insurance uses their doctors and I wasn't allowed to see my own doctor.' He maintained he disclosed having suffered prior injuries to the doctors that treated him. Then he added, 'most of the time the assistants are the ones that saw me.' . . . [¶] The defendant maintained he does not feel it

18

is right that he is being treated like a criminal. . . . The defendant said, 'I'm the victim here.' He maintained he was the victim of discrimination while working at the [district] and feels 'this conviction is ridiculous.' "

On this record, we conclude defendant cannot meet his burden to show the court's refusal to reduce his four felony convictions to misdemeanors was " 'irrational or arbitrary.' " (See *Alvarez*, *supra*, 14 Cal.4th at p. 977.) Indeed, the record shows the court recognized it had the discretion to reduce his felony convictions to misdemeanors and analyzed some of the key factors in making this determination including the " 'nature and circumstances of the offense' " and " 'the defendant's appreciation of and attitude toward the offense.' " (See *id.* at p. 978.)

The record shows the court found what defendant did in this case was "quite serious," inasmuch as he was convicted of four felonies and a "decent amount of money" was involved.

More significantly, the record shows the court—which had presided over defendant's trial—found it very concerning that defendant did not take responsibility for what he had done. The court specifically noted that defendant's convictions were not "ridiculous," as defendant contended, and that there was more than sufficient evidence to support the jury's findings in this case. In addressing defendant, the court stated that when a person gets "convicted of four felonies, you are, in fact, a criminal. You are, in fact, a felon, and I don't know how else you can be treated, other than be required to go and speak with the probation officer; and so, I don't really understand what Mr. Lopez's point is there [in stating he is the victim]."

19

The court also noted that defendant had a criminal history, which included six misdemeanor convictions.  Although the court recognized those convictions were "rather old," it noted they tended to undermine defendant's position he was a "law abiding individual."  We thus conclude the court properly exercised its discretion when it refused to reduce defendant's felony convictions to misdemeanors.

### DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

20