FRANSON, Acting P.J.
*142 *324 INTRODUCTION
Operating under their company, P & R Med-Legal Medical Corporation (P & R), Dolphus Dwayne Pierce, a chiropractor, and Tomas Ballesteros Rios, a physician, conspired with others to defraud various workers' compensation insurance carriers. P & R contracted with physicians to perform cursory (if any) examinations of workers' compensation patients at chiropractic clinics, and then dispense prepackaged medications to these patients with little or no regard for medical need. Pierce and Rios contracted with a company to prepare and submit scanned medical reports and bills to workers' compensation insurance carriers. These bills sought payment for the medications dispensed, and for services relating to the dispensing of medications-some of which were not performed, and some costlier than the services actually performed by the physician. Eventually, a search warrant was executed on businesses and homes associated with P & R. After P & R shut down, Pierce and Rios contracted with another company to rebill the insurance carriers for services initially billed by P & R, seeking to collect on existing unpaid bills for medications previously dispensed.
STATEMENT OF THE CASE
In June 2012, Pierce and six codefendants (Rios, John Brent Arakelian, Maria Cecilia Rios Cabangangan, Charles Orlando Lewis, M.D., Cathy Aguilar Pierce, and Chi Hong Yang, M.D.) were charged by grand jury indictment, in count 1, with conspiracy to commit insurance fraud ( Pen. Code,[1] §§ 182, subd. (a)(1), 550, subd. (a)(1), (2), (5), (7), (8) ; Ins. Code, § 1871.4, subd. (a)(2) )[2] ; 127 overt acts were alleged. As enhancements, it was further alleged that, in the commission of the offense, defendants damaged or destroyed property valued in excess of $65,000 (§ 12022.6, subd. (a)(1)); in excess of $200,000 (§ 12022.6, subd. (a)(2)), in excess of $1.3 million (§ 12022.6, subd. (a)(3)); in excess of $3.2 *325 million (§ 12022.6, subd. (a)(4)); and that they committed two or more related felonies involving fraud or embezzlement (§ 186.11, subd. (a)(1)).[3] In counts 2, 4, 6, 8, 10, 12, 14, 16, 18, and 20, defendants were charged with submitting multiple bills for the same service ( § 550, subd. (a)(8) ), and in counts 3, 5, 7, 9, 11, 13, 15, 17, 19, and 21, with false statements (physician reports) to obtain payments for medical services provided to workers' compensation patients ( Lab. Code, § 3207 ; Ins. Code, § 1871.4, subd. (a)(2) ).
Following several demurrers and preliminary motions, the case proceeded to trial on an amended indictment, which included the same substantive, but more specific, allegations contained in the original.
On October 22, 2015, jury trial against *143 Pierce alone began.[4] At the close of the prosecution's case, the trial court denied Pierce's motion for acquittal as to counts 1, 2, 4, 5, 12, 14, 18, and 21, but granted it as to all of the monetary enhancements attached to count 1, and as to substantive counts 3, 6, 7, 8, 9, 10, 11, 13, 15, 16, 17, 19, and 20.
At the conclusion of the evidence, the prosecution elected to proceed using only 13 of the 127 alleged overt acts of count 1. The object of the conspiracy was to commit insurance fraud, and the violations of sections 550, subdivision (a)(5) (preparing a report with intent to present it in support of fraudulent claim), (7) (submitting a claim for an unused health care benefit), (8) (preparing multiple claims for the same health care benefit with the intent to defraud), and Insurance Code section 1871.4, subdivision (a)(2) (presenting knowingly false statements in support of workers compensation benefits), were the means to achieve this object and pertained only to P & R.
On January 8, 2016, the jury returned a verdict of guilty on count 1 and acquitted Pierce of the remaining counts. On September 16, 2016, the trial court placed Pierce on probation for five years, with the condition that he serve one year in county jail and pay $770,421 in restitution.
On appeal, Pierce raises numerous issues, contending the trial court prejudicially erred: (1) when it overruled his demurrer to count 1 of the amended indictment; (2) when it refused to strike reference to section 550, subdivision (a)(5) from the conspiracy charge as surplusage; (3) when it denied a motion to compel election of conspiracies at the close of the prosecution's case; (4) in jury instructions given and refused; (5) when it denied a motion for acquittal; (6) when it quashed his subpoenas to the *326 insurance companies and admitted the testimony of two attorneys; and (7) when it denied his motion for recusal. Finally, Pierce contends sentencing error occurred. We affirm.
STATEMENT OF THE FACTS
Prosecution's Evidence
Witness Tomas Rios, M.D.
Rios pled guilty to conspiracy as charged in count 1 and testified for the prosecution.
In the mid 1990's, while still a medical resident, Rios began moonlighting at a physician's group as a disability evaluator for Social Security claimants, where he met Dr. Lonnie Powell, a chiropractor. The physicians' group rented office space from Powell in Visalia, and Rios saw Social Security disability patients there two weekends a month.
During this time, Rios familiarized himself with the operations of medical corporations having a chiropractic partner, and between 1999 and 2002, Rios and Powell formed Physicians Medical Management Group (PMMG), which managed independently contracted physicians to provide medical services as secondary treating physicians for workers' compensation patients at various chiropractic locations throughout California.[5] Most of the chiropractors whose workers' compensation patients were seen by these independent contractor physicians were friends and acquaintances *144 of Rios or Powell. The chiropractors were seeking physicians to provide medication and care for their workers' compensation patients.
As explained by Rios, in the workers' compensation system generally, the chiropractor (as primary treating physician) can provide therapy, but many patients need some type of pain medication, which a chiropractor cannot prescribe. The chiropractor would then refer the patient to a PMMG physician (as a secondary treating physician), who would come to the chiropractic clinic, do their own evaluation and prescribe medication if appropriate. The physician generated a report and signed it, a bill was then prepared, and the report and bill were sent out by PMMG to the workers' compensation insurance carriers. Payment was made by the carriers to PMMG.
Rios knew which various current procedural terminology (CPT) codes were related to the medical services provided and determined which CPT
*327 codes would be billed by PMMG for a physician's services. According to Rios, because the cases referred by chiropractors to the physicians involved nonsurgical muscular-skeletal injuries, the injuries were similar from patient to patient. As such, Rios "already" knew what treatment would be required for the physician to manage the patient, allowing Rios to predetermine what code was necessary to bill. Unless the physician corrected the report to indicate such services were not provided, it was billed as Rios predetermined.
Rios testified that there are five levels of examinations specified in the CPT billing codes, ranging from the most basic to the most complex. The report given to the physician would have a specific, predetermined statement on the level of care expected of him, such as a comprehensive medical examination or an intermediate medical consultation. The initial consultation could take anywhere from 30 to 60 minutes and the CPT billing code for that consultation was set at the highest level of service. Follow-up consults were scheduled for less time and billed for less. Rios acknowledged that he might not have specifically articulated to the physicians hired by PMMG that the treatment level, depicted in the reports he showed them as examples, were necessarily the CPT codes that would be billed.
PMMG also created a formulary of medicines purchased by PMMG that could be dispensed by the consulting physician. The formulary was a collection of medications Rios predetermined would be used in the practice, although the independent contractor physician could also write a prescription for medication they deemed more appropriate. PMMG would purchase medications to be dispensed with an expectation of later repayment by the workers' compensation insurance carrier. Since 80 to 90 percent of the workers' compensation patients referred to the physicians suffered back pain, it was anticipated that the physicians would utilize the formulary of medicines that were available for dispensing. Rios testified that he expected the physicians to dispense medication, because "that's the reason why [the physician is] in the clinic in the first place."
In 2003, Rios began doing business with Pierce. By this time, Rios was not only actively engaged in PMMG, but he had also partnered with various other medical groups and clinics. Pierce had chiropractic practices in Avenal and Huron and was familiar with the PMMG business plan of placing a physician in a chiropractic clinic to serve as a secondary treating physician.
Rios and Pierce met to discuss forming rural health clinics in Avenal and Huron. Pierce provided the offices for the clinics as part of his contribution to the venture.
*145 Rios suggested a business similar to PMMG. Pierce was familiar with this type of consultation because he had treated workers' compensation patients and had physicians come to his office to examine and dispense medication to patients who needed it.
*328 In January 2004, P & R was formed to operate as PMMG did. Rios was the 51 percent owner, Pierce owned 49 percent. Pierce was the incorporator of P & R and its president. Because Pierce knew many chiropractors, it was agreed he would market P & R services to them. A form lease was created for the physicians; they were to pay for each day or half day of space they used at various chiropractic offices when seeing workers' compensation patients. Pierce met with prospective chiropractors to discuss the services P & R could provide; Rios's duty was to find physicians that, "in [his] judgment, have a working understanding of what a secondary treating physician would be."
At a May 2005 P & R shareholder's meeting, Pierce, as treasurer, reported that P & R "was doing very well and ... presently has five (5) doctors that are doing examinations for chiropractors and writing reports. He advised that [P & R] is making a very good profit but could be doing much better.... [And] if the workers['] compensation insurance will start accepting their responsibility to their workers that he anticipates that [P & R] could become very profitable."
A company called Premier Interpreting and Support Services (Premier) handled a variety of tasks for P & R, including billing, scheduling the physicians, providing medical assistants for the physicians on site, and providing typing services to generate the final physician's report. Premier was owned on paper by Rios's sister Cecilia Cabangangan (one of the original codefendants), but the business was capitalized by Rios. Rios hired Veronica Aguayo as the office manager at P & R and Premier. She had previously been Rios's medical assistant and was familiar with his practice routine.
Rios directed Aguayo on how he would like to set the formulary, how to have an adequate supply of medications available to dispense, and how the physician's reports were to be generated. Rios directed Aguayo to tell the physicians their DEA registration numbers would be used to purchase medications they would be dispensing.
Rios created the template worksheets, used to generate typewritten reports, for the physicians to fill-out after they had completed an exam. Spaces in the template allowed the physician to note symptoms other than those set forth in various alternative template paragraphs. The reports were then transcribed using the template manual to create the report in narrative form. This was done in the Philippines by Rios's relatives, who were paid by Premier. Rios's relatives handled the transcribing for P & R, as well as for other medical groups and clinics owned by Rios. In the early stages of P & R, the finished reports were given to the physicians to review and sign; later the reports were scanned by a server with electronic signatures already affixed.
*329 Patty Steck oversaw billing at Premier. She initially reported to Rios, who showed her what CPT codes to use for office visits, etc., and directed her on how to determine the price to bill for dispensed medication. At one point, Rios decided to "downcode" comprehensive consultations to intermediate ones because insurance carriers were either disputing the charges or down coding them on their own. Rios decided to accept the down coded payment rather than having the matter in dispute; Rios told Pierce about this.
*146 Sometime before the search warrants were executed on April 15, 2008, Rios decided to wind down his practices, including the operation of P & R, and allow California Consultation Medical Corporation (CCMC), owned by Pierce and Yang, one of the contracted physicians with P & R (and original codefendant), to take over the P & R practice, including existing medication supplies, medical charts, and seeing P & R patients. Rios was to receive consideration for the assets P & R was transferring to CCMC.
Witness Monica Murphy, M.D.
Monica Murphy, previously a physician, was granted use immunity upon the prosecutor's request before her testimony. Following a conviction for tax evasion in 2003, Murphy was not able to practice on her own and was hired as a physician by Rios to work for Visalia Industrial and P & R. She later lost her medical license and worked for P & R as a medical assistant for about a year.
As a physician at P & R, Murphy dispensed medication to patients, medications which were based on a formulary that she did not have input into. P & R did not notify patients of the option to receive a prescription for medications they could use on their own, rather than having them distributed at the clinic. As a physician at P & R, Murphy did not think she could change the diagnosis of the patient made by the chiropractor.
Initially, Murphy dictated a report of her visit with the patient, forwarded the dictation to Rios, Rios transcribed it into a report, and she then signed it, a process that took several months. Murphy did not have any documents in her possession to compare her original report with the final report. Later, Rios developed a template which generated the typewritten report. The signatures were affixed via electronic signature, which Murphy did not do herself. She did not have the capability to log onto the computer system to see the final report.
On the template, Murphy circled numbers to match preprinted language. She did not always have the guide book of CPT codes to know which numbers she was circling. Murphy testified that her schedule did not allow *330 for a "comprehensive top-down review" of each patient, and if the final report reflected that such had occurred, it would not be true. Murphy was unfamiliar with the coding requirements for different CPT office visits or consultation codes. Murphy claimed she had very little interaction with Pierce and he never advised her on a medical issue.
Witness Cynthia Jones, M.D.
Cynthia Jones, M.D., worked for P & R as a physician for approximately two years, beginning in 2005. When she was hired by Rios, he explained that she would be using a template to help generate reports, but he did not discuss much in terms of the actual patient care she would be responsible for. She understood her "purpose" in that position was to dispense "a particular group of drugs," the formulary, which was "profitable when they billed the work[ers'] comp[ensation] company." She did not dispense all the drugs to every patient, and it was not until "later that [she] figured out that they had expected [her] to do that."
Jones was trained by Dr. Yang. Yang showed her how to complete the template that generated the final report. Yang told her to randomly circle different numbers of CPT codes for consecutive patients so that the reports would not all look the same. Yang told Jones it was not really important what numbers were circled, so she circled them at random.
*147 Jones acknowledged that she never did a case conference, a post-exam case conference with the chiropractor to discuss a patient's needs, although she always checked the template "yes" to indicate that a case conference had taken place. She thought either Aguayo or Yang most likely told her to do that. Jones also acknowledged that she never did a comprehensive consultation with a new patient, but she claimed she did not know if she circled certain numbers on the template that would indicate otherwise. There was no template language on the worksheet for an option of "no medications" dispensed.
Jones was not given the key to the template used until over a year after she started working for P & R. Once she received the key, she still circled numbers randomly. Jones met Pierce only twice and did not discuss billing with him.
Witness Chi Hong Yang, M.D.
Yang surrendered his medical license as a condition of his guilty plea to a conspiracy involving all named defendants charged in count 1. When Yang met Pierce, Pierce explained in general the physician consultation position and some of the paperwork involved. Pierce told Yang that Rios, as the *331 physician who also had a law degree, would explain how to complete the form used to make a completed medical report. Yang would be paid per day or half day of work.
Yang then met with Rios, who explained more about the template and told him he did not have to worry about which paragraph numbers he circled. At P & R, Yang usually saw 10-15 patients a day, for around 20 minutes per patient. Yang testified he did not do comprehensive examinations, although he examined every patient carefully.
Yang's signature to the reports were affixed electronically, although Yang testified that, after he participated in a deposition in August of 2007, he was told to electronically sign the finished report personally.[6] Yang did not feel it necessary to check the report with his records.
The longest Yang spent talking to a chiropractor about a patient while working at P & R was two minutes, and he never documented those conversations. He spoke to the chiropractor for only about 20 percent of the patients he had seen. Nevertheless, while working at P & R, Yang circled on the template that a case conference had been done on every case. He also circled "reverse case conference," which would generate a report to the chiropractor that he had participated in a case conference. He was told to do this by office manager Aguayo.
Yang also worked at the Huron and Avenal medical clinics, and claimed that, when he signed the contract to work at the clinics, he thought he was signing a contract to work for P & R. Although he was the medical director of the clinic in Huron, Yang did not hire the physician assistants, Rios did. Yang testified that it was Pierce who was his boss and he was the one who determined what the contents of the medical charts at the rural clinics should contain, but he was not certain who determined what medications to have on hand. Aguayo told him he needed to have a separate DEA number to purchase medication for each rural clinic.
In late 2007, Yang and Pierce decided to form their own company which would eventually take over P & R. Their company, *148 CCMC, was incorporated in January 2008, with Yang owning 51 percent and Pierce owning 49 percent. In this new business, Yang visited the same chiropractic offices he had previously visited for P & R and saw the same patients. They used the same template that was developed at P & R in late 2007, and Yang personally signed the template used to generate reports, which were sent off for completion. *332 During Yang's trial testimony, he was asked about the two days of depositions he participated in during the investigation of a workers' compensation case.[7] Yang testified that, after the first deposition session, Pierce told him he should state during the second session that he had always checked the patient charts before he signed them, which was not true. Yang testified that, while he did not want to lie, he needed a job and he did not want P & R to close, which Pierce said would happen if "things [did] not go well." Yang testified he made the untrue statement because he was asked to do so by Pierce.
During the second deposition session, an attorney, Michael Farley, provided by Pierce, was present with Yang. Pierce told Yang that Farley would be there because Yang was "so nervous" during the first deposition session. In anticipation of the second session, Yang stated he brought the medical billing code book with him and let Farley know that he had it. Farley told him to keep the code book in his "suitcase" and not to take it out before Farley told him to do so. Yang was asked about the code book during the deposition. When he began to answer, Farley stopped him and "beg[a]n to argue with the person in the deposition." Yang understood this to mean that he should not produce the code book, so he did not. Instead, Yang testified "I make a whole bunch of lie after that. I tell a lot of lie." One such lie was that he had taken the code book with him to each patient visit to help him circle the correct code numbers for the visit. Yang felt that this was what Farley wished him to do.
When Yang was given a copy of the deposition and asked to review and sign it, Yang spoke to Pierce about his lies during the deposition. Pierce told him he would consult with Rios, who also had a law degree, but he never heard from them about it again, and Yang signed the deposition as being accurate.
A search warrant was executed on April 15, 2008, while Yang was working at a chiropractic office in San Leandro through CCMC. After the search, Yang called Pierce, because he was his boss. The following day, Yang and Pierce met Farley. Pierce told Yang that CCMC could not continue doing business because their "computer[s] and everything" were seized, and asked for Yang's company credit card and car, which he returned. Pierce told Yang to get an attorney and not to discuss the issues with anyone.
Approximately a year later, Cathy Pierce asked Yang to sign 126 patient charts for consultations that took place before April 15, 2008, so they could be billed. Yang eventually complied. CCMC was eventually dissolved in December 2009.
*333 Witness Veronica Aguayo
Aguayo testified she began as a medical assistant for Rios and chiropractor Steven Booth. She then went to work with Rios at another of his corporations and in late 2003 began at Premier as the office manager. Aguayo and Rios's sister Cabangangan, who owned Premier, hired billers for Premier, including Patty Steck. It was Cabangangan who gave the billers directions *149 on how to bill. When Rios and Pierce created P & R in 2004, Aguayo became the office manager there. In that position, she worked as a medical assistant and recruited physicians for the various companies. She also maintained the schedule for the medical assistants and ordered medications.
In her position at P & R, Aguayo had contact with Pierce "[a]lmost daily," and often accompanied him to various clinics around the state. She also had frequent contact with Pierce's wife Cathy, who did the bookkeeping and accounts payable for P & R. Aguayo and Pierce discussed collections, the schedule, and medications. Regarding collections, Pierce wanted to know what P & R collections were each day. Aguayo faxed Pierce information on how well insurance carriers were paying in response to bills issued by Premier. The two talked at times about how to increase the amount of money paid by the carriers. Pierce provided Aguayo with a form he had used in his own chiropractic offices which he wanted the billers at Premier to use. The form was to be sent out with the bills and explained why certain codes needed to be paid, resulting in quicker payments. Pierce expressed to Aguayo how he wished the billing to be done, and she would instruct the billers to do so. In January of 2008, Aguayo sent a fax to an attorney, on behalf of Pierce, asking whether P & R could continue to bill certain medical procedural codes.
After being asked by Pierce to do so, Aguayo began tracking every individual patient to see what the insurance carrier was or was not paying for. This led to color coding patient files to more easily determine which carriers paid and which did not.
According to Aguayo, when P & R began, the whole set of medications, or formulary, would be given to every patient. With information gathered from the color-coding system, Pierce directed Aguayo to give each individual patient only the medications his or her insurance was paying for. Pierce explained to Aguayo that this was necessary to keep P & R profitable. No billing was done on P & R's behalf after May 15, 2008.
Witness Edith Cuartas
After law enforcement executed the search warrant on the businesses and homes associated with P & R in April 2008, Premier dissolved, and a few *334 months later, P & R closed. On February 1, 2009, Pierce and Rios on behalf of P & R contracted with Edith Cuartas, owner of Alpha Billing and Collection (Alpha), to rebill only for the medications P & R dispensed earlier. Pierce and Rios gave Cuartas an accounts receivable report for P & R and the amount was "in the millions." Alpha began rebilling for P & R in 2009 and continued through 2012, collecting between $1 and $2 million dollars for P & R.
Defense
Pierce testified in his own behalf. He had been a chiropractor for many years in Huron and Avenal. After he was injured, it became more difficult for him to treat patients, and he became interested in converting his chiropractic offices into rural health clinics.
Pierce did not dispute that P & R, in practice, was operating in a manner to defraud workers' compensation insurance carriers. However, he claimed ignorance of any fraudulent billing practices and that he had no intent to defraud. Pierce testified that his role was to market the P & R model to chiropractors and pay expenses to keep the business running, and that it was Rios who was responsible for all medical aspects of P & R, including what medical services P & R would provide and bill *150 for. While Rios had explained to him how P & R would operate, Pierce took no steps to educate himself on the details of the P & R operation on the medical side.
Pierce placed much of the blame with the physicians who were contracted to work at P & R, but he stated that he "never thought they would be dishonest." Pierce claimed he did not know the physicians were not conferring with the chiropractors about the patient's care and were not truthful in noting the level of care provided or amount of time spent with the patients. As to the later rebilling for medications, Pierce, relying on Rios, believed the medications were actually dispensed because of tracking forms. Rios had also told him physicians would not dispense medications without doing an examination.
DISCUSSION
I. DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT OVERRULED PIERCE'S DEMURRER TO COUNT 1 OF THE AMENDED INDICTMENT?**
*335 II. DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT REFUSED TO STRIKE REFERENCE TO SECTION 550, SUBDIVISION (a)(5) FROM THE CONSPIRACY CHARGE AS SURPLUSAGE?
Pierce contends the trial court prejudicially erred in not striking section 550, subdivision (a)(5) (preparing a report with intent to present it in support of fraudulent claim) from the conspiracy charge as surplusage (i.e. not relevant to the workers' compensation issues). We disagree.
Procedural Background
The amended indictment alleged that Pierce conspired to commit insurance fraud pursuant to section 550, subdivision (a), subsections (1), (2), (5), (7), and (8) and pursuant to Insurance Code section 1871.4, subdivision (a)(2). A violation of section 550, subdivision (a), subsections (1), (2), and (5), is designated as a felony, whereas a violation of subsections (7) and (8) is either a misdemeanor or felony wobbler. ( § 550, subd. (c)(1) and (2)(A)(B).)
Prior to trial, Pierce joined codefendant Lewis's motion to "strike surplusage from amended indictment," in which Lewis argued that subdivision (a)(1), (2), and (5) of section 550 "do not apply to claims for worker's compensation health care benefits," due to subdivision (a)(10). The district attorney filed an opposition. The trial court, in a written ruling, granted the defense motion as to section 550, subdivision (a)(1) and (2), but denied the motion as to subdivision (a)(5).
Applicable Law and Analysis
This issue presents a question of statutory interpretation, which we determine independently. ( Simpson v. Unemployment Ins. Comp. Appeals Bd. (1986) 187 Cal.App.3d 342, 350, 231 Cal.Rptr. 690.) Our function in interpreting a statute is to ascertain legislative intent so as to effectuate the statute's purpose. ( Rudd v. California Casualty Gen. Ins. Co. (1990) 219 Cal.App.3d 948, 952, 268 Cal.Rptr. 624 ; California Teachers Assn. v. San Diego Community College Dist. (1981) 28 Cal.3d 692, 698, 170 Cal.Rptr. 817, 621 P.2d 856.) In determining legislative intent, we look first to the statute's words and give them their usual and ordinary meaning (unless a special meaning is specifically called for). ( *151 California Teachers Assn., supra , at p. 698, 170 Cal.Rptr. 817, 621 P.2d 856 ; Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299.) " 'When the language is clear and unambiguous, there is no need for construction. [Citation.] When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids,' " including the legislative history, the statutory scheme of which the statute is a part, and similar statutory schemes. ( *336 Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist. (1992) 8 Cal.App.4th 1554, 1562, 11 Cal.Rptr.2d 222, quoting People v. Woodhead (1987) 43 Cal.3d 1002, 1007-1008, 239 Cal.Rptr. 656, 741 P.2d 154.)
Section 550 criminalizes the act of knowingly preparing or presenting to an insurance company a false claim for benefits. Section 550 provides:
"(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
"(1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.
"(2) Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud.
"(3) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim.
"(4) Knowingly present a false or fraudulent claim for the payments of a loss for theft, destruction, damage, or conversion of a motor vehicle, a motor vehicle part, or contents of a motor vehicle.
"(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
"(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.
"(7) Knowingly submit a claim for a health care benefit that was not used by, or on behalf of, the claimant.
"(8) Knowingly present multiple claims for payment of the same health care benefit with an intent to defraud.
"(9) Knowingly present for payment any undercharges for health care benefits on behalf of a specific claimant unless any known overcharges for health care benefits for that claimant are presented for reconciliation at that same time.
*337 "(10) For purposes of paragraphs (6) to (9), inclusive, a claim or a claim for payment of a health care benefit also means a claim or claim for payment submitted by or on the behalf of a provider of any workers' compensation health benefits under the Labor Code."
The only issue before us is whether the trial court erred when it found section 550 subdivision (a)(5) applicable to workers' compensation claims and denied Pierce's motion to strike the allegation. As noted, in section 550, subdivision (a)(10), cited above, the statute specifically defines, "for purposes of paragraphs (6) to (9) inclusive, a claim for payment of a health care benefit" includes a "claim for payment submitted by or on the behalf of a provider of any workers' compensation health benefits under the Labor Code." (See People ex rel. Monterey Mushrooms, Inc. v. Thompson (2006) 136 Cal.App.4th 24, 30, 38 Cal.Rptr.3d 677.) Pierce argues that, because section 550, subdivision (a), subsections (6) - (10), includes workers' compensation claims as "health care benefits," and subsection (5) does not, that subsection was *152 not meant to include the alleged workers' compensation fraud claim against him and should have been struck by the trial court.
In a lengthy written ruling, the trial court addressed the legislative history of section 550, subdivision (a), which was added by statute in 1992, and the 1993 amendment to it of what is now subsection (10), which specifically clarified that the term "health care benefits" included workers' compensation benefits. As stated by the trial court, while the Legislature repeatedly documented its understanding that existing law already criminalized this type of workers' compensation fraud, the addition of subsection (10) did not intend to change the law but only to clarify that the term "health care benefits" included workers' compensation benefits.
The trial court, finding that section 550, subdivision (a) subsections (6) and (8) appeared closely related to subsections (1) and (2), with the former governing "health care benefits" and the latter "loss or injury," struck the subsection (1) and (2) allegations. However, it found that subsection (5) "refers to neither 'loss of injury' nor 'health care benefits.' " Instead, the trial court found subsection (5) prohibited the preparation, making or subscribing of " 'any writing' " with the intent to present it or allow it to be presented in " 'support of any false or fraudulent claim.' " Therefore, the crime under subsection (5) is not in making a claim, or submitting multiple claims, but it is one of "preparation , etc." of a writing with the intent of allowing the writing to be used for the specified purpose.
We agree with the trial court that subsection (5) makes criminal such preparation, regardless of whether the proposed claim violates any of the other subsections of section 550, subdivision (a), or other statutes defining or *338 proscribing false or fraudulent claims. We agree, as noted by the trial court, that subsection (5) is the only portion of section 550, subdivision (a) that specifically relates to the preparation of documents, and it was intended by the Legislature to apply to all fraudulent workers' compensation claims.
In any event, assuming arguendo that the trial court should have struck the section 550, subdivision (a)(5) allegation, Pierce can show no prejudice. The remaining allegations against him in the count 1 conspiracy to commit insurance fraud ( § 182, subd. (a)(1) ), was that Pierce did so by knowingly presenting a false claim or multiple false claims for health care benefits ( § 550, subd. (a)(7) & (8) ) and knowingly presenting any false or fraudulent material statement in support of a claim for workers' compensation benefits ( Ins. Code, § 1871.4, subd. (a)(2) ). The jury found count 1 true based on one or more of the alleged overt acts, none of which involved the preparation of a fraudulent document, as alleged in section 550, subdivision (a)(5). Thus, even had the section 550, subdivision (a)(5) allegation been struck, Pierce would still have been found guilty.
III.-V.***
VI. ARE THERE OTHER ERRORS THAT CUMULATIVELY PREJUDICED PIERCE?
Pierce next contends the trial court made other errors which prejudiced the defense. We address each contention in turn but find no error and/or resultant prejudice.
A. Denial of Discovery
Pierce first argues that the trial court erred in quashing his subpoenas to the insurance carriers.
*153 Procedural Background
Prior to trial, codefendant Lewis served subpoenas duces tecum on five named insurance carriers[14] for a variety of documents, namely correspondence or communication by the named insurance carriers with various entities concerning alleged fraudulent billing by P & R; medical consultant opinions comprising the basis for approval or denial of payment for medication dispensed and office consultations; and appraiser and/or adjuster manuals for *339 evaluating and/or denying claims for outpatient evaluation and management and treatment. Lewis filed and served a motion for in camera review and for release of the documents. Pierce joined in the motion, but the trial court denied the motion as to Pierce and one other codefendant for lack of standing.
The trial court made an initial threshold finding that a showing had been made that the items sought had some relevance and that good cause for production had been shown, subject to objections raised by the insurance carriers. Motions to quash were filed by the insurance carriers.
Following argument, the trial court ordered the insurance carriers to comply with that portion of the requests which sought "production of all correspondence or communication by the designated person with Kern County Deputy D.A.'s or Kern County D.A. or California Dept. of Insurance Investigators ... concerning alleged fraudulent billing by the designated corporate entities ... during the calendar years 2004-2012, inclusive." In all other respects, the trial court sustained the objections and granted the motions to quash, finding the probative value and relevance of the documents sought to be minimal, burdensome and oppressive.
Applicable Law and Analysis
Pierce now contends denying production of "the insurer victim adjustor manuals and medical opinions given to support their denial of P & R bills" was error since it was necessary to show that "the carrier standards and policies were for reviewing and approving bills, and whether people opining on lack of medical necessity on their behalf were qualified to render those opinions."
We first question Pierce's standing to address this issue on appeal. The trial court denied Pierce's motion to join the discovery request for "lack of standing," although no rationale for this denial appears in the written ruling. In any event, we address Pierce's denial of the discovery claim and find no error.
Generally, this court "review[s] a trial court's ruling on discovery matters under an abuse of discretion standard." ( People v. Superior Court (Meraz) (2008) 163 Cal.App.4th 28, 48, 77 Cal.Rptr.3d 352 ; see People v. Prince (2007) 40 Cal.4th 1179, 1232, 57 Cal.Rptr.3d 543, 156 P.3d 1015.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." ( People v. Giminez (1975) 14 Cal.3d 68, 72, 120 Cal.Rptr. 577, 534 P.2d 65.)
Under Insurance Code section 1871.4, materiality of a false statement is an element of the offense. (See *340 People v. Gillard (1997) 57 Cal.App.4th 136, 151, 66 Cal.Rptr.2d 790.) A specific insurance carrier's internal standards and policies for reviewing and approving health care benefit claims may have some probative value in determining what statement, representation, *154 or omission is material. However, intent, not materiality was at issue here. As stated by the trial court in its denial of the request for production of appraiser and/or adjuster manuals for evaluating or denying claims for paying health care benefits to medical providers:
"Assuming ... insurance carriers possess such manuals, they would disclose the policies of such carriers and could lead to evidence as to whether or not such carriers followed their policies in those instances where they rejected or paid claims made by Defendants. Whether or not such carriers followed their own policies is irrelevant. The issue is whether or not the billings submitted were fraudulent under applicable legal standards. If, for the sake of argument, we were to assume that the documents sought might disclose one or more instances of a denial of payment in violation of the insurance carrier's internal policies, this would not evidence whether or not the billings were fraudulent."
As such, in quashing the defense subpoenas, the trial court reasonably concluded that the defense requests for such internal documents was of minimal relevance and value for the defense, and overburdensome on the insurance carriers. (Cf. People v. Kaurish (1990) 52 Cal.3d 648, 687, 276 Cal.Rptr. 788, 802 P.2d 278 [concluding that trial court did not abuse its discretion in granting prosecution's motion to quash a defense subpoena to discover certain police reports, because defendant's request "was broad and somewhat burdensome" and defendant "failed to provide greater specificity or a greater showing of relevance in his broad discovery request"].)
Moreover, even if the court erred in denying the request, no prejudice resulted. Pierce, who contends only that the "extent of [the error] cannot be currently ascertained," does not show a reasonable probability that the trial's outcome would have been different had the discovery request been granted.
B.-D. †
VII. DID THE TRIAL COURT ERR IN DENYING PIERCE'S RECUSAL MOTION?
Pierce next contends that the trial court erred in denying his motion to recuse the trial prosecutor and the entire Workers' Compensation Fraud Unit of the Kern County District Attorney's Office under section 1424.
*341 Background
In September of 2013, codefendant Lewis moved to recuse the trial prosecutor under section 1424, on the ground of prosecutorial misconduct. Pierce joined this recusal motion, and the trial court denied the motion.
In January of 2015, Pierce again moved to recuse the trial prosecutor, and this time, all deputy district attorney members of the Kern County Workers' Compensation Fraud Unit, and/or the entire Kern County District Attorney's Office under section 1424. As argued by Pierce:
"The Kern County District Attorney's Workers Compensation Fraud Unit is funded by the California Insurance Commissioner upon the advice and consent of the Fraud Division and Fraud Assessment Commission as to the most effective distribution of grant funds to the various California District Attorneys ( 10 C.C.R. § 2698.52(f) ). The grant funds available are based upon assessments statutorily imposed upon insurance companies as determined each year *155 by the fraud assessment commission ( Insurance Code Section 1872.83(b)(1) ). In addition, amounts collected as fines for violations of Workers Compensation statutes are added to the assessments ( Insurance Code Section 1872.83(b)(4)(c) )."
According to Pierce, this statutory funding scheme for the fraud unit "empowers the insurance commissioner to exercise control over criminal prosecutions," locking the district attorney into a particular course of action. As evidence of this, Pierce cited, inter alia, to the Kern County District Attorney's Office statement to the Insurance Commission that it would always seek Labor Code fines in addition to criminal restitution and fines, negating the flexibility envisioned by the California Legislature in enacting the Labor Code civil fines.
The district attorney filed an opposition, and Pierce filed a reply to the opposition.
Following a hearing on the issue, the trial court denied Pierce's recusal motion, explaining, in part:
"In this instance, the Court finds no actual conflict and no apparent conflict. This Court further finds there has been no showing of an 'actual likelihood' of prejudice. It is of further significance that the entity providing the financial assistance is a public agency and not the actual victim (corporate or otherwise). [¶] Prosecutors certainly have the right to set policies and to publicize policies. In most instances, following policies goes a long way to dispel any suggestion of unequal application of the law. Prosecuting agencies have the right (and the power and the discretion) to make exceptions to policies and sometimes do. Adopting or publicizing policies does not deprive the DA's office of the discretion or authority to deviate from policies. In fact, the prior dispositions in this case, suggest that *342 the DA has exercised discretion in examining the contextual involvement of individual defendants and relative strengths and weaknesses of evidence that differ between defendants, as well as other factors. The fact that the District Attorney's office has set and publicized certain policies (which appear to be consistent with Legislative intent), which it is not legally obligated to follow, does not constitute an actual or potential conflict of interest. [¶] There is nothing improper about a public agency seeking an efficient return on its investment or considering issues of efficiency in making law enforcement decisions. [¶] ... [¶] Here, at most, Defendants have shown that under certain conditions, a prosecutor might have a theoretical motive to pursue a non-meritorious case. This is not sufficient to meet the Defendants' burden of proving an actual or apparent conflict of interest, sufficiently grave to demonstrate an actual likelihood of prejudice towards moving Defendants."
Applicable Law and Analysis
Section 1424 establishes the standard governing motions to recuse a prosecutor. The motion "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) Under the statute, a defendant has the burden of showing by evidence that (1) a conflict of interest actually exists and (2) the level of conflict is so high that it is "unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) People v. Eubanks (1996) 14 Cal.4th 580, 592, 59 Cal.Rptr.2d 200, 927 P.2d 310 ( Eubanks ) clarifies and expands this statutory standard to all portions of the proceedings, but it reiterates that even in the presence of actual conflict, *156 the conflict must be of sufficient gravity to demonstrate an "actual likelihood of prejudice."
We review the trial court's decision to deny a recusal motion for an abuse of discretion. ( Hollywood v. Superior Court (2008) 43 Cal.4th 721, 728-729, 76 Cal.Rptr.3d 264, 182 P.3d 590.) "Accordingly, we must determine whether the trial court's findings were supported by substantial evidence and whether, in turn, those findings support the decision to deny recusal. [Citation.]" ( People v. Gamache (2010) 48 Cal.4th 347, 361-362, 106 Cal.Rptr.3d 771, 227 P.3d 342.) The defendant bears the burden of demonstrating a genuine conflict. ( Haraguchi v. Superior Court (2008) 43 Cal.4th 706, 709, 76 Cal.Rptr.3d 250, 182 P.3d 579.)
At issue is whether the statutory funding scheme for the investigation and prosecution of workers' compensation insurance fraud ( Ins. Code, § 1872.83 ) created a conflict of interest for the district attorney. As argued by Pierce, a conflict exists because the Kern County Workers' Compensation Fraud Unit receives grant funding from the California Insurance Commission. The funds, based *343 on assessments statutorily imposed upon insurance companies, are used to criminally prosecute workers' compensation fraud cases, and includes the salaries and benefits of the two prosecutors in the unit (the prosecutor in this case being one of the two), as well as the salaries of the unit's investigator and paralegal, the computers and software. The grant funds are determined by the Fraud Assessment Commission, as outlined in Insurance Code section 1872.83, which provides in relevant part:
"(b) To fund increased investigation and prosecution of workers' compensation fraud, ... there shall be an annual assessment as follows: ... [¶] ... [¶]
"(d) After incidental expenses, at least 40 percent of the funds to be used for the purposes of this section shall be provided to the Fraud Division of the Department of Insurance for enhanced investigative efforts, and at least 40 percent of the funds shall be distributed to district attorneys, pursuant to a determination by the commissioner with the advice and consent of the division and the Fraud Assessment Commission, as to the most effective distribution of moneys for purposes of the investigation and prosecution of workers' compensation fraud cases and cases relating to the willful failure to secure the payment of workers' compensation. Each district attorney seeking a portion of the funds shall submit to the commissioner an application setting forth in detail the proposed use of any funds provided. A district attorney receiving funds pursuant to this subdivision shall submit an annual report to the commissioner with respect to the success of his or her efforts...."
The statute goes on to state that, if a district attorney is unable or unwilling to investigate and prosecute workers' compensation fraud claims, the commissioner "shall discontinue distribution of funds allocation for that county and may redistribute those funds according to this subdivision." ( Ins. Code, § 1872.83, subd. (e).)
As evidence of the alleged conflict, Pierce cites to an August 13, 2010, letter to the Department of Insurance addressing the anticipated 2011-2012 budget, in which the prosecutor in this case stated that the county "remain[ed] committed to utilizing our program funds to achieve high levels of productivity and maximum results; convictions; commitment rates and restitution for our victims." An August 2012 letter from the Kern County Supervising District Attorney reiterated that sentiment.
*157 Pierce alleges that, by accepting grant funding, the Kern County District Attorney agreed to criminally prosecute future cases, rather than civilly under Labor Code section 3820. Pierce argues, "The starting point of every discretionary prosecution decision that involved the amount of money *344 claimed stolen was skewed by the prosecutor's decision to maximize restitution to the insurance carrier victims, even if the loss claimed was more than was due."
We first determine whether a conflict of interest exists between the district attorney's office and the defendant. A conflict exists if the evidence shows that the prosecutor is biased against the defendant, or if such animosity affects others within the prosecutorial office. ( Eubanks, supra , 14 Cal.4th at p. 596, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The analysis focuses not on the mere appearance of a conflict of interest, but on a reasonable probability that the prosecution will treat the defendant unfairly. ( People v. Neely (1999) 70 Cal.App.4th 767, 776, 82 Cal.Rptr.2d 886.)
Moreover, recusal of an entire prosecutorial office is a drastic step that imposes a substantial burden on the People. ( Lewis v. Superior Court (1997) 53 Cal.App.4th 1277, 1286, 62 Cal.Rptr.2d 331.) " '[W]hen the entire prosecutorial office of the district attorney is recused and the Attorney General is required to undertake the prosecution or employ a special prosecutor, the district attorney is prevented from carrying out the statutory duties of his elective office and, perhaps even more significantly, the residents of the county are deprived of the services of their [locally] elected representative in the prosecution of crime in the county.' [Citation.]" ( Eubanks, supra , 14 Cal.4th at p. 594, fn. 6, 59 Cal.Rptr.2d 200, 927 P.2d 310.) It is therefore reasonable to require that the defendant establish a showing that such a step is necessary to avoid an unfair trial. ( Lewis v. Superior Court, supra , at p. 1286, 62 Cal.Rptr.2d 331.)
In Eubanks , on which Pierce relies, the question was whether a crime victim's payment of substantial investigative expenses already incurred by the public prosecutor created a disabling conflict of interest for the prosecutor, requiring his disqualification. The defendants in Eubanks were accused of conspiracy to steal trade secrets. ( Eubanks, supra , 14 Cal.4th at pp. 584-585, 59 Cal.Rptr.2d 200, 927 P.2d 310.) Because the police department and prosecutor's office lacked staff with expertise to search the company's computers, a computer specialist was located and the company agreed to pay for the services. The district attorney indicated he allowed the company to pay for the assistance because the computer specialist's role was purely technical, involving no opinion as to whether trade secrets had been stolen, and because the prosecutor's office was " 'experiencing serious budgetary constraints.' " ( Id. at p. 586, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The superior court concluded the payment by the company put the district attorney in a position of feeling " 'a greater obligation for this particular victim,' " and the district attorney might not " 'exercise its discretionary function in an even-handed manner.' " ( Id. at p. 587, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
*345 The Court of Appeal reversed the recusal order, overturning the trial court's finding of conflict and holding that any conflict (if any) was insufficiently grave to justify recusal. ( Eubanks, supra , 14 Cal.4th at pp. 584, 587-588, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The Supreme Court gave great deference to the trial court's discretion in finding the existence of a conflict of interest and reversed the Court of Appeal. The Supreme Court also clarified that (despite the language of section 1424), the correct standard for recusal under that statute encompasses both actual *158 and apparent conflicts and that the likelihood that a defendant would not receive a fair trial (or actual likelihood of prejudice in all portions of the proceedings) must be real and not apparent. ( Eubanks, supra , at pp. 592-593, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
Here, however, the entity providing the financial assistance is a public agency and not the actual victim (corporate or otherwise). As noted by the trial court here, Pierce confuses the role of a victim, as discussed in Eubanks , with the role of government agencies which represent the People and have obligations to follow statutory arrangements enacted by the Legislature. As stated by the trial court:
"Taken to its logical conclusion, [Pierce's] argument would preclude the prosecution of any crime in which the victim was a resident of Kern County, since the District Attorney's Office is funded in part by county funds, and the source of such funds are taxes paid by Kern County residents."
We agree with the trial court's finding that no actual conflict or apparent conflict existed, and that there was no showing of an actual likelihood of prejudice requiring recusal. We reject Pierce's claim to the contrary.
VIII. DID SENTENCING OR RESTITUTION ERROR OCCUR?††
DISPOSITION
The judgment is affirmed.
WE CONCUR:
SMITH, J.
SNAUFFER, J.

All further statutory references are to the Penal Code unless noted otherwise.

Prior to trial, the section 550, subdivision (a)(1) and (2) allegations were struck as surplusage.

This allegation was dismissed prior to trial.

On September 23, 2015, the charges against Pierce's wife, Cathy, were dismissed for insufficient evidence on motion of the People.

Under the workers' compensation scheme, the definition of a "physician" includes a chiropractic practitioner. (Lab. Code, § 3209.3.) For clarity purposes, we will refer to medical doctors as "physicians" and chiropractic practitioners as "chiropractors."

Yang participated in a deposition involving a claim filed by an employee against her employer and its workers' compensation carrier. The deposition took place in two parts-the first in August of 2007 and the second in January of 2008.

See footnote 6, ante.

See footnote *, ante .

See footnote *, ante .

Liberty Mutual Insurance Company, Berkshire Hathaway Homestate Companies, Traveler's Property Casualty, Zenith Insurance Company, and State Compensation Insurance Fund.

See footnote *, ante .

See footnote *, ante .